IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

**THE STATE OF ARIZONA,**
*Appellee,*

*v.*

**JOHNATHAN IAN BURNS,**
*Appellant.*

No. CR-11-0060-AP
Filed March 10, 2015

Appeal from the Superior Court in Maricopa County
The Honorable Karen L. O'Connor, Judge
No. CR2007-106833
**AFFIRMED**

COUNSEL:

Mark Brnovich, Arizona Attorney General, John R. Lopez IV, Solicitor General, Jeffrey A. Zick, Chief Counsel, Jeffrey L. Sparks (argued), Assistant Attorney General, Capital Litigation Section, Phoenix, for State of Arizona

David Goldberg (argued), Attorney at Law, Fort Collins, CO, for Johnathan Ian Burns

JUSTICE BRUTINEL authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE PELANDER, and JUSTICES BERCH and TIMMER joined.

JUSTICE BRUTINEL, opinion of the Court:

¶1 This automatic appeal arises from Johnathan Ian Burns' conviction and death sentence for the murder of Jackie H. We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 13-4031.

## I. FACTUAL BACKGROUND[1]

¶2 On January 27, 2007, Jackie and Burns met at a gas station and went out on a date. Later that evening, Jackie called her sister Randi. Jackie sounded "a little off" and "nervous" and asked Randi to meet her at the gas station as quickly as possible. Randi promptly went to the gas station and waited for Jackie. Two hours later, Jackie called Randi and said she was lost. Jackie sounded confused and could not describe where she was. Burns eventually took the phone and told Randi he was lost, but said he and Jackie would arrive within fifteen minutes. Randi waited for several hours, but Jackie never arrived. Later that day, Randi told her parents that Jackie was missing.

¶3 The next day, a maintenance worker found, in an apartment complex dumpster, Jackie's purse and the blouse, bra, panties, and sandals she was wearing the previous evening. The blouse and bra were torn, and the blouse was stained with Jackie's blood and had two bullet holes from a close-range firearm discharge. Semen on the panties matched Burns' DNA.

¶4 Police arrested Burns and searched his home and vehicles. In the trunk of Burns' Honda Civic, police found a pair of men's jeans stained with Jackie's blood. In Burns' truck, which he was driving the night Jackie disappeared, officers discovered Jackie's blood and an earring she had worn. Inside Burns' home, police found a case for a Springfield 9mm handgun, but no gun. Mandi Smith, Burns' fiancée at the time, had purchased the gun for Burns, who was a prohibited possessor (Smith later pleaded guilty to misconduct involving a weapon based on her purchase of the gun).

¶5 Almost three weeks later, Jackie's body was discovered in the Sycamore Creek area. Jackie had suffered two fatal gunshot wounds to her head and several skull fractures from blunt force impacts on her left temple,

---

[1] The facts are presented in the light most favorable to sustaining the verdict. *State v. Garza*, 216 Ariz. 56, 61 n.1, 163 P.3d 1006, 1011 n.1 (2007).

on top of her head, and under her right eye. She also had vaginal bruising likely caused by blunt force. Sperm on an anal swab taken from Jackie's body matched Burns' DNA. The medical examiner determined that wild animals had severed Jackie's head postmortem. Burns' cellphone records indicated that he drove to the Sycamore Creek area the night Jackie disappeared and stayed there for several hours.

¶6 Shortly before his arrest, Burns had disposed of the Springfield 9mm handgun Mandi had purchased for him. Police later located the handgun. A ballistics expert determined that it had fired a bullet found in the sand beneath where Jackie's head had been.

¶7 The State charged Burns with sexual assault, kidnapping, first-degree murder, and misconduct involving weapons; a jury found Burns guilty on all counts.

¶8 During the aggravation phase of the trial, the jury found two aggravating circumstances: (1) Burns had a prior or contemporaneous felony conviction under A.R.S. § 13-751(F)(2); and (2) the murder was especially cruel, heinous, or depraved under A.R.S. § 13-751(F)(6). After the penalty phase, the jury determined that Burns should be sentenced to death. In addition to imposing the death sentence for the murder, the trial court sentenced Burns to consecutive prison terms totaling sixty-eight years for the other three convictions.

## II. ISSUES ON APPEAL

¶9 Burns raises twenty-six issues on appeal. For the reasons stated below, we affirm his convictions and sentences.

### A. Continuance

¶10 Burns contends the trial court abused its discretion by denying his motions to continue the guilt and penalty phases of his trial. We will not find that a trial court abused its discretion in denying a continuance unless the defendant shows prejudice. *State v. Barreras*, 181 Ariz. 516, 520, 892 P.2d 852, 856 (1995); *see also State v. Lamar*, 205 Ariz. 431, 437 ¶ 32, 72 P.3d 831, 837 (2003). Burns argues he was prejudiced because (1) he could not produce the results of a functional MRI exam; (2) Dr. Wu, Burns' neuropsychiatrist, could not analyze Burns' PET scan; (3) Dr. Cunningham, Burns' expert on developmental psychology and prison

3

violence, could not present Burns' risk assessment for violence in prison; and (4) Burns could not rebut the testimony of Dr. Kirkley, the State's psychological expert.

¶11 At Burns' request, the superior court continued the guilt phase of the trial three times, adding more than a year to counsel's preparation time. One of these continuances was due to Burns' refusal to cooperate with counsel's efforts to prepare mitigation evidence, while the other two were granted because Burns' counsel needed additional time to prepare. Burns moved to continue the guilt phase three more times, but the trial court denied those motions. After the jury found Burns guilty, Burns asked for a month-long recess, which the court also denied.

¶12 Continuances "shall be granted only upon a showing that extraordinary circumstances exist and that delay is indispensable to the interests of justice." Ariz. R. Crim. P. 8.5(b). In considering such a request, a trial court must "consider the rights of the defendant and any victim to a speedy disposition of the case." *Id.*

¶13 Although denying counsel adequate time to prepare a case for trial may deny the defendant a substantial right, *State v. Narten*, 99 Ariz. 116, 120, 407 P.2d 81, 83 (1965), time constraints by themselves do not create prejudice. *See State v. Salinas*, 129 Ariz. 364, 367, 631 P.2d 519, 522 (1981). In determining whether a defendant's rights were violated, this Court looks to the totality of the circumstances. *See Barreras*, 181 Ariz. at 520, 892 P.2d at 856.

¶14 Because Burns has failed to show prejudice, we cannot conclude that the trial court abused its discretion. The court gave defense counsel more than another year to prepare, and Burns' trial did not begin for three-and-a-half years after indictment. Further, all of the evidence Burns claims he was unable to present pertains to the mitigation stage of the trial, which did not commence until four years after indictment. Despite the trial court's refusal to grant additional continuances, Burns was able to present twelve days' worth of mitigation that included much of the information he alleges he could not offer because of time constraints.

¶15 For example, Dr. Wu testified at length about Burns' low frontal-lobe activity and showed Burns' PET scans to the jury. The court precluded only a few portions of Dr. Wu's testimony relating to the analysis

Dr. Wu failed to disclose during a pre-trial interview that took place *after* his report was complete and that was disclosed mere days before he testified. Similarly, Dr. Cunningham's rebuttal testimony was not timely disclosed and was therefore precluded, but was also irrelevant for the purpose offered.[2]

**¶16** Additionally, Burns fails to explain how a functional MRI scan would have aided his mitigation.[3] Because Burns has not provided any basis for this argument, he has failed to demonstrate prejudice.[4] *State v. VanWinkle*, 230 Ariz. 387, 391 ¶¶ 10–13, 285 P.3d 308, 312 (2012). Similarly, Burns was able to meaningfully rebut Dr. Kirkley's testimony through his own experts, and thus was not prejudiced.

**¶17** Notably, Jackie's family repeatedly voiced frustration at the delays in the trial. Under Rule 8.5(b), the trial court must consider the victims' right to a timely resolution of the charges and did not err by proceeding with the trial after three-and-a-half years. Ariz. R. Crim. P. 8.5(b); *State v. Dixon*, 226 Ariz. 545, 555 ¶ 56, 250 P.3d 1174, 1184 (2011).

**¶18** The trial court did not abuse its discretion in denying the continuance motions.

## B. Limitation of Defense Counsel's Voir Dire

**¶19** Burns contends the trial court erred in preventing defense counsel from asking prospective jurors if they would consider a life sentence for a defendant convicted of sexual assault and kidnapping in addition to murder. "We review a trial court's ruling on voir dire for an

---

[2] The preclusion of Dr. Wu's and Dr. Cunningham's testimony is fully discussed in our analysis of a different issue in Section P, *infra*.

[3] We found only one reference to the functional MRI in the more than 10,000-page record. Defense counsel indicated only that, due to time constraints, a functional MRI could not be completed.

[4] Burns argues that, because it is unknown what the functional MRI would have shown, he was prejudiced because he lost his chance to show the jury whatever the MRI might have shown. But to demonstrate prejudice, a defendant must do more than merely speculate that relevant mitigation may have been uncovered with more time. *See State v. VanWinkle*, 230 Ariz. 387, 392 ¶ 12, 285 P.3d 308, 312 (2012).

abuse of discretion." *State v. Patterson*, 230 Ariz. 270, 273 ¶ 5, 283 P.3d 1, 4 (2012).

**¶20** In capital cases, a trial court must permit a defendant to ask potential jurors whether they would automatically vote for the death penalty. *Morgan v. Illinois*, 504 U.S. 719, 729–33 (1992). But we have rejected the argument that *Morgan* entitles a defendant to ask prospective jurors whether they will vote for death based on specific aggravating factors. *State v. (Joe C.) Smith*, 215 Ariz. 221, 231 ¶ 42, 159 P.3d 531, 541 (2007).

**¶21** The trial court's rulings complied with *Morgan*. Burns was permitted to ask prospective jurors in both the juror questionnaires and during voir dire whether they would automatically vote for the death penalty. But he was not entitled to ask whether they would impose the death penalty based on the specific facts of his case. Under *Smith*, the trial court properly stopped this line of questioning and did not abuse its discretion. 215 Ariz. at 231 ¶ 42, 159 P.3d at 541.

## C. Jurors Struck for Cause

**¶22** Burns argues the trial court unconstitutionally struck three jurors—68, 186, and 198—for cause because of their views on the death penalty. We review a trial court's rulings on strikes for cause for an abuse of discretion, giving deference to the judge who was able to observe the potential jurors. *State v. Glassel*, 211 Ariz. 33, 47 ¶ 46, 116 P.3d 1193, 1207 (2005).

**¶23** A court may not strike a juror merely because he or she "voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *State v. Prince (Prince II)*, 226 Ariz. 516, 528 ¶ 27, 250 P.3d 1145, 1157 (2011) (internal quotation marks omitted). But a judge "may strike a juror whose views about capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* (internal quotation marks omitted). A trial judge must consider the entirety of a prospective juror's demeanor and behavior; if a juror's promise to uphold the law is coupled with ambiguous statements and uncertainty, the trial judge may strike the juror for cause. *State v. Lynch*, 225 Ariz. 27, 35 ¶ 28, 234 P.3d 595, 603 (2010); *State v. Roque*, 213 Ariz. 193, 204–05 ¶¶ 18–20, 141 P.3d 368, 379–80 (2006). A potential juror need not object to the death

penalty in every possible case to warrant a dismissal for cause. *Prince II*, 226 Ariz. at 528 ¶ 29, 250 P.3d at 1157.

### 1. Juror 68

¶24 During voir dire, Juror 68 said she had "mixed feelings" about the death penalty because she felt "that life sentencing is bad enough." She also indicated that her religious beliefs would interfere with her ability to impose the death penalty. Nonetheless, during defense counsel's questioning, Juror 68 said she could vote to impose the death penalty in the proper case. The trial judge struck Juror 68 for cause.

¶25 The trial court did not abuse its discretion by striking Juror 68. There was an adequate basis for the trial judge to determine that Juror 68's performance could be substantially impaired by her feelings about capital punishment.

### 2. Juror 186

¶26 During voir dire, Juror 186 said that the death penalty should be reserved for people with a violent criminal history "like serial killers" and that he could not impose the death penalty unless a defendant had a violent criminal past.

¶27 The trial court did not abuse its discretion by striking Juror 186. A juror does not have to object to the death penalty in every conceivable case to be excluded for cause. *Id.* The trial court had an adequate basis for determining that Juror 186's feelings about capital punishment would have substantially impaired his ability to serve fairly and impartially.

### 3. Juror 198

¶28 Juror 198's juror questionnaire revealed that she feared dying, could not vote for a death sentence, and could not look at "photos of death." When the State asked if her fear of dying might interfere with her ability to impose the death penalty, Juror 198 replied, "I don't know. It depends how I felt after I've seen all of the evidence." The court struck Juror 198 for cause. Based on Juror 198's inability to say whether she could follow the law notwithstanding her fear of death, the trial court did not abuse its discretion in striking her.

### D. Failure to Sever Charges

¶29        Burns argues the trial court erred in denying his motion to sever the charges.  We review for an abuse of discretion, and reverse only if the defendant can show "compelling prejudice against which the trial court was unable to protect."  *State v. Murray*, 184 Ariz. 9, 25, 906 P.2d 542, 558 (1995) (quoting *State v. Cruz*, 137 Ariz. 541, 544, 672 P.2d 470, 473 (1983)).

¶30        The State charged Burns with sexual assault, kidnapping, misconduct involving weapons, and first-degree murder under both premeditated- and felony-murder theories.  Before trial, Burns moved to sever all charges and proceed to trial only on the premeditated-murder charge.  After an evidentiary hearing, the trial court denied the motion, finding the charges sufficiently intertwined and related to consolidate them for trial.

¶31        The state may join charges that are of the same or similar character, are based on the same conduct, or are alleged as part of a common scheme or plan.  Ariz. R. Crim. P. 13.3(a).  But a trial court must grant a motion to sever charges if "necessary to promote a fair determination of the guilt or innocence of any defendant of any offense . . . ."  Ariz. R. Crim. P. 13.4(a).

¶32        Joinder is permitted if separate crimes arise from a series of connected acts and are provable by overlapping evidence.  *State v. Prince* (*Prince I*), 204 Ariz. 156, 160 ¶ 17, 61 P.3d 450, 454 (2003); *see also State v. Prion*, 203 Ariz. 157, 162 ¶ 32, 52 P.3d 189, 194 (2002).  A common scheme or plan, under Rule 13.3(a)(3), is a "particular plan of which the charged crime is a part."  *State v. Hausner*, 230 Ariz. 60, 74 ¶ 45, 280 P.3d 604, 618 (2012) (quoting *State v. Ives*, 187 Ariz. 102, 109, 927 P.2d 762, 769 (1996)).

¶33        The sexual assault, kidnapping, and murder were properly joined as part of a "common scheme or plan" under Rule 13.3(a).  The State alleged that Burns kidnapped Jackie intending to sexually assault her, sexually assaulted her, and then murdered her to prevent discovery of the kidnapping and sexual assault.  Much of the same evidence that proved the murder also proved the sexual assault and kidnapping.  The court did not abuse its discretion in consolidating these charges.

**¶34** We are troubled, however, by the failure to sever the misconduct-involving-weapons charge. The State prosecuted Burns for that charge under A.R.S. § 13-3102(A)(4), alleging that he possessed a firearm the night of the murder and was a prohibited possessor because he had two prior felony convictions for burglary. *See* A.R.S. § 13-3101(A)(7)(b). To prove the misconduct-involving-weapons charge, the State had to introduce evidence of Burns' prior felony convictions. The State notified Burns that, unless he was willing to stipulate to his prohibited-possessor status, it would introduce evidence of these prior felonies. Burns declined to stipulate, and the State introduced this evidence through a sanitized affidavit from the superior court clerk and testimony from Mandi Smith.

**¶35** But for joinder of the misconduct-involving-weapons charge, the evidence of Burns' prior felony convictions would not have been admissible during the guilt phase. Burns did not testify at trial, and any attempt to introduce the convictions would have been impermissible character evidence. *See* Ariz. R. Evid. 404(b). Simply put, trying the misconduct charge with the other charges permitted the jury to hear, during the guilt phase of the trial, that Burns was a convicted felon.

**¶36** We conclude that denial of the motion to sever was an abuse of discretion. Although Burns' possession of the murder weapon was cross-admissible for the murder and the weapons charge, his prior conviction was not and its admission created a serious risk of prejudice. *See United States v. Nguyen*, 88 F.3d 812, 815 (9th Cir. 1996) (noting uniform agreement among the federal circuit courts that introduction of prior convictions creates a dangerous potential for misuse of that information by the jury). There was no connection between Burns' illegal possession of the murder weapon and the murder, kidnapping, or sexual assault. That he had a gun was relevant: that it was illegal was not.

**¶37** Although the trial court instructed the jury that it must consider each offense separately, we are not persuaded that the instruction alone is sufficient in this context. Such an instruction requires the jury to ignore prior felony convictions in a capital criminal prosecution. We agree with the D.C. Circuit that this asks jurors "to act with a measure of dispassion and exactitude well beyond moral capacities." *United States v. Daniels*, 770 F.2d 1111, 1118 (D.C. Cir. 1985). Because Burns' prior felony conviction was prejudicial and irrelevant to the other charges, severance

"was necessary to promote a fair determination" of Burns' guilt or innocence under Arizona Rule of Criminal Procedure 13.4(a).

¶38 Nevertheless, on this record we find that the trial court's error was harmless. *See State v. Henderson*, 210 Ariz. 561, 567 ¶ 18, 115 P.3d 601, 607 (2005) ("Harmless error review places the burden on the state to prove beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence."). Evidence of Burns' guilt was overwhelming: He was the last person seen with Jackie, her blood was found in his truck and on a pair of jeans in the trunk of his Honda, his cellphone records indicated he was in the area where Jackie's body was found, his DNA matched sperm found in Jackie's body, and he possessed and disposed of the murder weapon. Moreover, the State did not emphasize Burns' conviction during closing argument, mentioning it only in the context of the weapons charge. There is nothing to indicate that the jury considered his prior convictions in contravention of the guilt-phase jury instructions, and this evidence was properly introduced in the penalty phase. Thus, we are satisfied that the failure to sever the misconduct charge did not affect the jury's verdicts or sentences.

¶39 We take this opportunity, however, to emphasize that trial courts should prevent this situation. Evidence of prior felony convictions has a potential to create prejudice, which is precisely the reason previous criminal convictions are generally inadmissible under Rule 404(b). Absent an appropriate factual nexus, trial courts generally should not join a misconduct-involving-weapons charge, or any charge that requires evidence of a prior felony conviction, unless the parties have stipulated to a defendant's status as a prohibited possessor. Alternatively, the court could conduct a bifurcated trial to adjudicate any charge that requires evidence of a prior felony conviction. Likewise, the State should avoid the risk of reversal by refraining from joining charges that require proof of a defendant's prior convictions. But, for the reasons stated above, we do not find prejudice on this record.

### E. Duplicitous Charges

¶40 Burns next contends that, because the felony-murder indictment alleged both kidnapping and sexual assault as predicate felonies, it was duplicitous. Burns argues that this deprived him of a unanimous verdict regarding the felony-murder charge. We disagree.

10

**¶41** "An indictment is duplicitous if it charges more than one crime in the same count." *State v. Anderson*, 210 Ariz. 327, 335 ¶ 13, 111 P.3d 369, 377 (2005). Duplicitous indictments are prohibited in part because they present the chance for non-unanimous jury verdicts. *Id.* But, we have held that if substantial evidence supports each alleged predicate offense, a felony-murder conviction should be upheld since a defendant is not entitled to a unanimous verdict on precisely how the murder was committed. *State v. Hardy*, 230 Ariz. 281, 288 ¶¶ 29–30, 283 P.3d 12, 19 (2012).

**¶42** Burns was convicted of sexual assault and kidnapping, both of which are predicates for felony murder. *See* A.R.S. § 13-1105(A)(2). Substantial evidence supported his convictions on both charges. Burns was not entitled to a unanimous jury finding that the murder furthered a particular felony, only a unanimous agreement that the murder furthered *a* predicate felony. *See Hardy*, 230 Ariz. at 288 ¶¶ 29–30, 283 P.3d at 19. Moreover, this point is moot because the jury unanimously found Burns guilty of premeditated murder in addition to felony murder. *See Anderson*, 210 Ariz. at 343 ¶ 59, 111 P.3d at 385 (reasoning that when a jury returns guilty verdicts for both felony and premeditated murder, a first-degree murder conviction would stand even absent a felony-murder predicate).

## F. First-Date Testimony

**¶43** Burns contends the trial court erred by allowing the State to elicit, and use in its opening statement and closing argument, testimony that Jackie had never dated anyone before and was on her "first date." Burns argues this testimony violated Arizona's Rape Shield Law, A.R.S. § 13-1421, by impermissibly commenting on Jackie's chastity. This type of evidence, however, is not prohibited by § 13-1421, which states:

> A. Evidence relating to a victim's reputation for chastity and opinion evidence relating to a victim's chastity are not admissible in any prosecution for any offense in this chapter. Evidence of specific instances of the victim's prior sexual conduct may be admitted only if a judge finds the evidence is relevant and is material to a fact in issue in the case and that the inflammatory or prejudicial nature of the evidence does not outweigh the probative

value of the evidence, and if the evidence is one of the following:

1. Evidence of the victim's past sexual conduct with the defendant.

2. Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, disease or trauma.

3. Evidence that supports a claim that the victim has a motive in accusing the defendant of the crime.

4. Evidence offered for the purpose of impeachment when the prosecutor puts the victim's prior sexual conduct in issue.

5. Evidence of false allegations of sexual misconduct made by the victim against others.

¶44       We recognize the potential for misuse of a victim's reputation for chastity in a murder trial. *See* Michelle J. Anderson, *From Chastity Requirement to Sexuality License: Sexual Consent and a New Rape Shield Law*, 70 Geo. Wash. L. Rev. 51, 104–07 (2002) (detailing studies of juror bias based on perceived promiscuity or virginity of rape victims). But evidence of how many "dates" someone has had does not necessarily reflect on that person's chastity. *See Richardson v. State*, 581 S.E.2d 528, 640–41 (Ga. 2003) ("Evidence merely that the victim has or had a romantic relationship with another man does not reflect on her character for sexual behavior."); *Banks v. State*, 366 S.E.2d 228, 230 (Ga. Ct. App. 1988) (holding evidence that victim was "going steady" did not open the door to evidence of sexual experience); *State v. Miller*, 870 S.W.2d 242, 245 (Mo. Ct. App. 1994) (refusing to endorse the "cynical notion" that dating is synonymous with sexual activity). While one could infer that a victim who has never gone on a date before is more likely to be a virgin than someone who has, we do not believe that the relationship between the use of the term "first date" in this case and sexual conduct is so close that it falls into the ambit of § 13-1421.

¶45       Burns also argues that this testimony warranted a mistrial under Arizona Rule of Evidence 403. Because Burns failed to object on this

ground at trial, we review only for fundamental error. *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607. "Fundamental error is error going to the foundation of the case . . . of such magnitude that defendant could not possibly have received a fair trial." *State v. Rutledge*, 205 Ariz. 7, 13 ¶ 32, 66 P.3d 50, 56 (2003) (quoting *State v. Hughes*, 193 Ariz. 72, 86 ¶ 62, 969 P.2d 1184, 1198 (1998)). We find no error here. Evidence that Jackie's date with Burns was her first date helped to place her actions in context and thus was probative. And because Burns has not shown that the evidence posed a danger of unfair prejudice under Rule 403, he cannot show error, much less fundamental error.

### G. Presence of GHB in the Victim's Organs

**¶46** Before trial, Burns moved to preclude any evidence regarding the presence of gamma-hydroxybutyric acid ("GHB") in Jackie's liver tissue. At a pretrial hearing, an expert for the State testified that GHB is often used as a date-rape drug that causes confusion and unconsciousness, but is also produced by the body in small amounts. The expert further testified that the small amount of GHB found in Jackie's liver tissue could have been from natural causes, but it could also have shown that Jackie was drugged with GHB before her death. The trial court found the evidence relevant and that its probative value outweighed any prejudice. The court permitted the State to present essentially the same evidence at trial, although it disallowed use of the term "date-rape drug." Burns contends that the trial court erred in allowing evidence of the GHB in Jackie's liver because its origin was unknown. We review the trial court's ruling for an abuse of discretion. *State v. Dann*, 220 Ariz. 351, 365 ¶ 66, 207 P.3d 604, 618 (2009).

**¶47** Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence." Ariz. R. Evid. 401(a). The State's theory was that Burns killed Jackie to keep her from telling the police that she was raped. On the night she was murdered, Jackie sounded confused and disoriented when she spoke on the telephone to Randi. Confusion and disorientation are side effects of ingested GHB. Thus, the testimony that the GHB in Jackie's liver tissue could have naturally occurred or resulted from someone giving Jackie a dose of the drug to subdue her was relevant to whether the sexual intercourse between Burns and Jackie was consensual. That the GHB might have been naturally present went to the weight of the evidence rather than its admissibility. *See*

*State v. Lacy*, 187 Ariz. 340, 349, 929 P.2d 1288, 1297 (1996) (holding that a lack of certainty regarding the source of admitted evidence goes to the weight of the evidence, not to its admissibility). Thus, the trial court did not abuse its discretion in admitting the GHB evidence.

¶48        Burns also argues the trial court abused its discretion by instructing the jury that "without consent" means that "the victim is incapable of consent by reason of mental disorder, mental defect, drugs, alcohol, sleep, or any other similar impairment." A party is entitled to any jury instruction reasonably supported by the evidence. *State v. Trostle*, 191 Ariz. 4, 15, 951 P.2d 869, 880 (1997). That GHB was found in Jackie's liver tissue and she sounded confused the night of the murder indicate Jackie might have been drugged with GHB. Because the jury instruction was supported by the evidence, we find no error.

### H. Mandi's Testimony that She Feared Burns

¶49        During an interview with the State, Mandi said she feared Burns, and he had previously threatened to kill her. The trial court initially precluded evidence of any specific threats made by Burns. It did, however, allow Mandi to testify on direct examination to her general feelings toward Burns. Burns' counsel spent much of his cross-examination attempting to establish that Mandi, not Burns, had killed Jackie. Burns' counsel also attempted to impeach Mandi's testimony that she feared Burns by eliciting testimony that Mandi never told the police that she was afraid of Burns. After cross-examination, the State asked the court to reconsider its previous ruling that Mandi could not testify as to specific acts by Burns that caused her to fear him, arguing that Burns had opened the door by implying that Mandi's testimony was recently fabricated. Over Burns' objection, the court allowed the State on redirect to question Mandi about specific threats Burns allegedly made on her life and Mandi's assertions that she planned to remove all the guns from her house because she feared Burns.

¶50        Burns contends the trial court erred in permitting Mandi's testimony because it was irrelevant, unduly prejudicial, and was other-act evidence prohibited under Rule 404(b).[5] Burns also argues he should have

---

[5]        Burns also argues that Mandi's testimony was not timely disclosed and should have been precluded, but does not support this claim with any argument or citation to the record. He has, therefore, waived this claim.

been permitted to re-cross-examine Mandi on certain subjects. We review for an abuse of discretion. *Dann*, 220 Ariz. at 365 ¶ 66, 207 P.3d at 618.

**¶51** Mandi's testimony that she feared Burns, that she planned to remove all the guns from their shared home, and that Burns threatened to kill her one week before Jackie's murder are all relevant to rebut Burns' contention that her testimony was a recent fabrication. *See* Ariz. R. Evid. 401(a)–(b). The probative value of this evidence was not substantially outweighed by any prejudicial effect. *See State v. Martinez*, 230 Ariz. 208, 213 ¶ 21, 282 P.3d 409, 414 (2012) (noting that not all harmful evidence is unfairly prejudicial, only that evidence which suggests a decision based on an improper basis such as emotion, sympathy, or horror).

**¶52** Burns' Rule 404 argument also lacks merit. Under Arizona Rule of Evidence 404(b), other wrongs or acts are not admissible to show that a person acted in conformity with his or her character. They may, however, be admissible for other purposes, such as rebutting an attempt to impeach a witness. *See State v. Williams*, 183 Ariz. 368, 376, 904 P.2d 437, 445 (1995) ("Evidence which tests, sustains, or impeaches the credibility or character of a witness is generally admissible, even if it refers to a defendant's prior bad acts.") (internal quotation marks omitted). Rule 404(b) does not apply to Mandi's testimony that she feared Burns or planned to remove guns from their home, because that testimony involves no other *act* by Burns. Mandi's testimony that Burns threatened to kill her before Jackie's murder was inadmissible to show that Burns was more likely to have killed Jackie, because it involved a specific threat made by Burns. That evidence, however, was properly admitted to rebut Burns' attempt to show that Mandi was not credible when she testified that she feared Burns. Thus, Burns' 404(b) argument fails.

**¶53** Burns' argument that he should have been permitted to re-cross-examine Mandi is also without merit. Burns asserts that he should have been allowed to question Mandi about a recorded phone conversation in which Mandi told Burns' co-worker that she was not afraid of Burns and that Burns was never violent with women. A trial court may, in its

---

*See State v. Carver*, 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989) ("[O]pening briefs must present significant arguments, supported by authority, setting forth an appellant's position on the issues raised. Failure to argue a claim usually constitutes abandonment and waiver of that claim.").

discretion, permit re-cross-examination on any new issue raised on re-direct. *State v.* (*Robert D.*) *Smith*, 138 Ariz. 79, 81, 673 P.2d 17, 19 (1983). Defense counsel, however, asked about this conversation on cross-examination, and no new issue arose during re-direct examination that would have warranted re-cross-examination. Thus, the trial court did not abuse its discretion.

### I. Jail Calls

¶54 Burns contends the trial court erred in admitting recordings of sixteen "irrelevant and prejudicial" phone calls that he made while in jail. We review the trial court's admission of this evidence for an abuse of discretion. *Dann*, 220 Ariz. at 372 ¶ 117, 207 P.3d at 625. In these calls, Burns spoke with Mandi and asked about the search for Jackie's body, whether his brother had cleaned out Burns' Honda, and whether Mandi would stay with him "no matter what." Over Burns' objection, the trial court allowed the recordings to be played to the jury and permitted testimony about the content of the calls.

¶55 The phone calls are clearly relevant. The conversations all tend to show that Burns was involved in Jackie's disappearance. The probative value of the statements is not substantially outweighed by any danger of unfair prejudice. *Martinez*, 230 Ariz. at 213 ¶ 21, 282 P.3d at 414. We find no abuse of discretion.

### J. Testimony Regarding Knives in Burns' Home

¶56 Burns contends the trial court erred in denying a mistrial after it inappropriately admitted evidence that the police found numerous "folding knives" inside Burns' home. We review the admission of evidence and the denial of a mistrial for an abuse of discretion. *See State v. Villalobos*, 225 Ariz. 74, 80 ¶ 18, 235 P.3d 227, 233 (2010); *State v. Kuhs*, 223 Ariz. 376, 380 ¶ 18, 224 P.3d 192, 196 (2010).

¶57 Before trial, Burns moved to exclude evidence of any weapons found in his home besides the murder weapon, a 9mm handgun. The trial court did not rule on the motion, but noted that the State had stipulated not to introduce evidence of any other weapons. But at trial, when asked by the State what was found in Burns' home, a detective testified that several folding knives were found. Burns moved for a mistrial. The prosecutor avowed on the record that the State had intended that the detective testify

about the 9mm handgun case and not the knives. The court denied the mistrial motion.

**¶58** "When unsolicited prejudicial testimony has been admitted, the trial court must decide whether the remarks call attention to information that the jurors would not be justified in considering for their verdict, and whether the jurors in a particular case were influenced by the remarks." *State v. Jones*, 197 Ariz. 290, 304 ¶ 32, 4 P.3d 345, 359 (2000). In this case, the detective briefly remarked that he had found knives, common household items, in Burns' home. These remarks would not have influenced the jury's verdict when viewed in context with the evidence that was properly before the jury. The court, therefore, did not err by denying Burns' request for a mistrial.

### K. Photographs of Jackie's Body

**¶59** Burns contends that the trial court erred when it admitted photographs of Jackie's body as it was discovered in the desert, as well as images of Jackie's skull. Before trial, Burns moved to preclude photographic evidence of Jackie's body. He contended that the photos and descriptions of Jackie's remains were not relevant, were unduly prejudicial, and only served to inflame the jury because Jackie's remains were in an advanced state of decomposition and wild animals had severed her head. The trial court denied Burns' motion, as well as several objections to specific photographs. The court found that the photographs had probative value, including the photographs of Jackie's skull, which helped explain the testimony of a forensic anthropologist, Dr. Fulginiti, who based her conclusions on an examination of the skull.

**¶60** Trial courts have broad discretion in admitting photographs. *State v. Spreitz*, 190 Ariz. 129, 141, 945 P.2d 1260, 1272 (1997).

**¶61** In *State v. Murray*, we set forth a three-part test for determining whether photographs of a murder victim are admissible: whether the photograph is relevant, whether it has "the tendency to incite passion or inflame the jury," and its probative value versus its potential to create unfair prejudice. 184 Ariz. 9, 28, 906 P.2d 542, 561 (1995). The trial court here properly applied this test.

**¶62** First, the photographs are relevant. A photograph of the deceased in any murder case is relevant to assist a jury in understanding an issue because the fact and cause of death are always relevant in a murder prosecution. *Spreitz*, 190 Ariz. at 142, 945 P.2d at 1273. The photographs show where the body was found and how it was hidden, and they helped the jury understand the expert testimony in the case. Although the photographs are gruesome, and thus had some potential to inflame the jury, their probative value outweighs any danger of unfair prejudice.

### L. Ballistic Expert Testimony

**¶63** Burns contends the trial court erred in admitting the testimony of the State's ballistics expert, Christian Gunsolley, who identified Burns' 9mm handgun as the murder weapon. Because Burns did not object at trial, we review for fundamental error. *State v. Valverde*, 220 Ariz. 582, 585 ¶ 12, 208 P.3d 233, 236 (2009).

**¶64** Burns contends that *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and amended Rule of Evidence 702 applied to his case and that the trial court erred by not holding a *Daubert* hearing. But, because the current version of Rule 702 is not a new constitutional rule, it does not apply to trials that ended before the new rule became effective on January 1, 2012. *State v. Miller*, 234 Ariz. 31, 41 ¶¶ 28–31, 316 P.3d 1219, 1228 (2013). Because the guilt phase of Burns' trial concluded on December 16, 2010, *Daubert* and new Rule 702 did not apply to his case.

**¶65** Burns argues that, even if *Daubert* does not apply, Gunsolley's testimony should still have been precluded under *Frye*. *See Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). But, because Gunsolley's testimony did not rely on any novel theory or process, it was also not subject to *Frye*. *See Logerquist v. McVey*, 196 Ariz. 470, 480 ¶ 31, 1 P.3d 113, 123 (2000) (holding that *Frye* applies only to expert testimony based on "novel scientific principles"). Thus, Burns has not established that the trial court erred in admitting Gunsolley's testimony, much less that it constituted fundamental error.

### M. Burns' Hearsay Statement about Consensual Sex

**¶66** Burns argues the trial court deprived him of his right to present a complete defense by refusing to allow testimony about his statements to police that he had consensual sex with Jackie. We disagree.

¶67 After Jackie's disappearance, Burns told police during an interview that he and Jackie had consensual sex in his truck. At trial, defense counsel asked the court to permit him to elicit testimony about this statement. The trial court refused because Burns' statements were hearsay.

¶68 Burns admits that his statements were hearsay but contends that they should have been admitted under the residual hearsay exception, which is now contained in Arizona Rule of Evidence 807. Rule 807 provides that hearsay that does not fall into any other exception may be admitted if (1) the statement has equivalent guarantees of trustworthiness, (2) it is offered as evidence of a material fact, (3) it is more probative than any other evidence that the proponent can obtain through reasonable efforts, and (4) admitting it will best serve the purposes of the rules and the interests of justice.

¶69 The residual hearsay exception "require[s] the out of court statement to have equivalent circumstantial guarantees of trustworthiness," and absent such guarantees, self-serving hearsay is inadmissible. (*Robert D.*) *Smith*, 138 Ariz. at 84, 673 P.2d at 22 (internal quotation marks omitted). When deciding if a statement is trustworthy, we consider "the spontaneity, consistency, knowledge, and motives of the declarant . . . to speak truthfully," among other things. *State v. Allen*, 157 Ariz. 165, 174, 755 P.2d 1153, 1162 (1988).

¶70 Burns' statements did not have circumstantial guarantees of trustworthiness. The statements were not spontaneous but were made in response to police questioning two days after Jackie's disappearance. Further, Burns was not motivated to speak truthfully. He was at a police station, speaking to police officers in an interview room about a murder investigation, a condition that does not necessarily elicit trustworthy answers. *Cf. United States v. Morgan*, 385 F.3d 196, 209 (2d Cir. 2004) (noting statements in response to police questioning and addressed to law enforcement officers lack equivalent guarantees of trustworthiness).

¶71 Burns also contends that his testimony was alternatively admissible under Arizona Rule of Evidence 106, which states that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." But the State did not introduce any writings

or recorded statements about Burns and Jackie having non-consensual sex. Burns' statements were therefore not "necessary to qualify, explain or place into context the portion already introduced . . . ." *State v. Cruz*, 218 Ariz. 149, 162 ¶ 58, 181 P.3d 196, 209 (2008) (citation and internal quotation marks omitted). Thus, the trial court did not abuse its discretion by excluding the statements.

## N. Evidence Supporting Burns' Convictions

**¶72** Burns claims (1) there was insufficient evidence to support the finding that he sexually assaulted Jackie; (2) there was insufficient evidence to find that he kidnapped Jackie; (3) sexual assault and kidnapping cannot serve as predicate offenses for felony murder; and (4) there was no evidence of premeditation to support the first-degree murder conviction. We review the facts in the light most favorable to sustaining the verdicts and resolve inferences against the defendant. *State v. Davolt*, 207 Ariz. 191, 212 ¶ 87, 84 P.3d 456, 477 (2004). We determine de novo whether the evidence introduced at trial is sufficient to support a conviction. *State v. West*, 226 Ariz. 559, 562 ¶ 15, 250 P.3d 1188, 1191 (2011). "Substantial evidence" to support a conviction exists when "reasonable persons could accept [it] as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *Id.* at 562 ¶ 16, 250 P.3d at 1191.

### 1. Evidence that Burns used immediate force to coerce sexual intercourse

**¶73** The State presented sufficient evidence to support the jury's finding that Burns coerced sexual intercourse with Jackie: Jackie's bra and blouse were ripped, and her blood was found in Burns' truck. Jackie suffered facial and skull fractures, and her vagina was bruised. She had GHB in her system and was confused and disoriented when she spoke to Randi on the phone. This evidence was sufficient for a reasonable person to conclude that Burns sexually assaulted Jackie.

### 2. Evidence of kidnapping

**¶74** Sufficient evidence also existed to support the jury's finding that Burns kidnapped Jackie. Kidnapping occurs when a person knowingly restrains another with the intent to inflict death, physical injury, or a sexual offense on the victim. A.R.S. § 13-1304(A)(3). "Restrain" means "to restrict a person's movements without consent, without legal authority, and in a

manner which interferes substantially with such person's liberty, by either moving such person from one place to another or by confining such person." A.R.S. § 13-1301(2). A person may restrain another by "[p]hysical force, intimidation or deception." *Id.*

¶75 Having found sufficient evidence to support the jury's finding that Jackie was sexually assaulted, we look to see if she was restrained against her will for the sexual assault to be accomplished. As noted above, there was evidence that Jackie's clothes were torn and that she was drugged with GHB. Additionally, Burns was carrying a gun that could have been used to confine Jackie in his truck. And Jackie never made it to the gas station where she told Randi to meet her. Accordingly, the State presented sufficient evidence to support Burns' conviction for kidnapping.

### 3. Evidence of kidnapping or sexual assault as a predicate offense for felony murder

¶76 Burns argues that Jackie's murder could not have occurred in furtherance of the sexual assault because the assault, if it occurred, was completed at a time and place remote from Jackie's murder.

¶77 For felony murder, the state must prove that the defendant caused the victim's death "in the course of and in furtherance of . . . or immediate flight from" the underlying offense. A.R.S. § 13-1105(A)(2). "A death is in furtherance of an underlying felony if the death resulted from an action taken to facilitate accomplishment of the felony." *State v. Jones*, 188 Ariz. 388, 397, 937 P.2d 310, 319 (1997).

¶78 There is sufficient evidence that Burns killed Jackie in furtherance of or during immediate flight from the kidnapping or sexual assault. The evidence that proves the kidnapping and sexual assault also proves the predicate felonies. Even if several hours passed between the attack and the murder, the evidence supports a finding that Burns never let Jackie out of his presence before driving Jackie to the desert and shooting her. The jury could have reasonably found that the murder was perpetrated in order to prevent Jackie from reporting the sexual assault or kidnapping.

¶79 Burns' argument that the kidnapping merged into the murder is also without merit. He asserts there is no evidence that Jackie was ever restrained until just before her death; thus, the intent to kill "merged" with

the intent to restrain. But Jackie's facial fractures, the GHB in her liver, and her failure to arrive at the gas station where she told Randi to meet her all suggest that Burns restrained Jackie in some manner in the hours proceeding her death. Jackie's body was found face down clutching a tree branch and a bullet was found where her head would have been, suggesting that she was ordered to lie down on her stomach and then shot. We have held that even mere moments between restraint and murder permits a finding that two offenses occurred. *See State v. Herrera*, 176 Ariz. 9, 16, 859 P.2d 119, 126 (1993) (holding kidnapping and murder were two distinct acts and did not merge where victim was ordered to lie on the grounds and then shot moments later).

¶80 Moreover, Burns was convicted of premeditated murder, which cannot merge with kidnapping. Two crimes do not merge when "[e]ach of the offenses . . . requires proof of a different element." *Blockburger v. United States*, 284 U.S. 299, 304 (1932); *see also Parker v. United States*, 692 A.2d 913, 916 (D.C. 1997). Premeditated murder obviously requires proof that the defendant killed with premeditation, whereas kidnapping requires restraining the victim. *See* A.R.S. §§ 13-1105(A)(1), -1304(A). Thus, even if we accept Burns' view of the evidence as true, the kidnapping did not merge with the murder.

### 4. Evidence of premeditation

¶81 Finally, there was sufficient evidence to allow the jury to find Burns guilty of premeditated murder. To establish premeditation, the state must be able to "convince a jury beyond a reasonable doubt that the defendant actually reflected" before the murder. *State v. Thompson*, 204 Ariz. 471, 479 ¶ 31, 65 P.3d 420, 428 (2003).

¶82 The State presented evidence that Burns brought a gun on a "date." He picked up Jackie, left Chandler, stopped for gas, and then drove to a remote location in the desert where he shot and killed Jackie. Sometime during the night, he sexually assaulted her. This provides sufficient circumstantial evidence to demonstrate premeditation. *See id.* (noting that the defendant's acquiring of a weapon before the killing is evidence of premeditation); *State v. Grell*, 205 Ariz. 57, 60 ¶ 21, 66 P.3d 1234, 1237 (2003) (holding that "driving to a remote area," among other facts, supported finding of premeditation). Additionally, the fact that Burns positioned Jackie on the ground before shooting her twice in the back of the head and

then hid her body shows that Burns actually reflected on whether to kill her.

### O. Multiplicity and Double Jeopardy

¶83　　　　Burns argues that using his sexual assault and kidnapping convictions both as predicate felonies and to satisfy the (F)(2) aggravator violates the Double Jeopardy Clause. Further, Burns argues the trial court erred by not instructing the jury that his multiple felony convictions only counted as one aggravator. Whether charges are multiplicitous is a matter of law, which we review de novo. *See State v. Boggs*, 218 Ariz. 325, 334 ¶ 38, 185 P.3d 111, 120 (2008) (noting that we review legal issues de novo). We also review de novo whether the trial court properly instructed the jury. *See Glassel*, 211 Ariz. at 53 ¶ 74, 116 P.3d at 1213.

### 1. Multiplicitous charges

¶84　　　　Burns argues that, because the State submitted both his sexual assault and kidnapping convictions as (F)(2) aggravators, the (F)(2) aggravator was multiplicitous and was improperly given additional weight. He did not raise this argument below, so we review for fundamental error. *See Henderson*, 210 Ariz. at 568 ¶ 22, 115 P.3d at 608.

¶85　　　　The (F)(2) aggravating factor requires the trier of fact to consider whether a defendant has been previously convicted of a serious offense. A.R.S. § 13-751(F)(2). Convictions for serious offenses committed at the same time as the homicide, or those consolidated for trial with the homicide, are considered prior convictions. The state may use multiple contemporaneous convictions to prove an (F)(2) aggravator. *Martinez*, 230 Ariz. at 213–214 ¶¶ 16–23, 282 P.3d at 414–15. Burns has not established fundamental error on this point.

### 2. Double jeopardy

¶86　　　　Burns also argues that it was improper for him to be convicted of kidnapping and sexual assault, and then for those offenses to be used to satisfy the serious offense requirement of A.R.S. § 13-751(J)(5) and (10), and to establish the (F)(2) aggravator. He claims that using the convictions in this manner resulted in multiple punishments, since he was sentenced to prison for the same felonies that were used as felony murder predicates and as capital aggravators.

¶87　　　We need not address this claim. Burns' double-jeopardy claims relate only to his conviction for felony murder. But because the jury also unanimously found Burns' first-degree murder conviction supported by a premeditated-murder theory, Burns' first-degree murder charge would stand regardless of whether the felony-murder conviction exists, and the kidnapping and sexual assault charges were independent of the premeditated murder. *Anderson*, 210 Ariz. at 343 ¶ 59, 111 P.3d at 385.

¶88　　　Burns' claim also fails on its merits. We have held, as Burns acknowledges, that an element of a crime may also be used as a capital aggravator. *Cruz*, 218 Ariz. at 169 ¶ 130, 181 P.3d at 216 (citing *State v. Lara*, 171 Ariz. 282, 284–85, 830 P.2d 803, 805–06 (1992)). We decline to overrule these cases.

### 3. Jury instruction on the (F)(2) aggravator

¶89　　　Burns argues the trial court failed to cure the errors enumerated above by not informing the jury that his prior convictions counted toward only one aggravating factor, the (F)(2) factor requiring proof of conviction of a prior serious offense. It does not appear that Burns requested this instruction below, and so we review for fundamental error. *Henderson*, 210 Ariz. at 568 ¶ 22, 115 P.3d at 608.

¶90　　　A prior conviction may be used to establish more than one aggravating factor, so long as the jury does not consider the conviction more than once in assessing the aggravating and mitigating circumstances. *State v. Chappell*, 225 Ariz. 229, 241 ¶ 48, 236 P.3d 1176, 1188 (2010). The trial court did not instruct the jury during the penalty phase that it could only consider the convictions once, although it did give this instruction in the aggravation phase. However, the instruction was unnecessary. Burns' prior convictions were only used to prove the (F)(2) aggravator. The state may present more than one prior conviction to satisfy the (F)(2) factor. *Martinez*, 230 Ariz. at 213–214 ¶¶ 16–23, 282 P.3d at 414–15. Moreover, the jury was instructed that it could only consider the aggravating factors that it found during the aggravation phase. Thus, Burns has not established fundamental error on this point.

### P. Preclusion of Burns' Expert Testimony

¶91　　　Burns asserts that the trial court erred in precluding testimony from some of his expert witnesses. "We review the trial court's

decision to exclude evidence for abuse of discretion." *Villalobos*, 225 Ariz. at 82 ¶ 33, 235 P.3d at 235; *State v. Jackson*, 186 Ariz. 20, 24, 918 P.2d 1038, 1042 (1996) (reviewing a court's "imposition and choice of sanction" for an abuse of discretion). While trial courts may preclude or limit a witness' testimony as a sanction for disclosure violations, doing so should be a remedy of last resort. Ariz. R. Crim. P. 15.7(a); *State v. Moody*, 208 Ariz. 424, 454 ¶ 114, 94 P.3d 1119, 1149 (2004).

**¶92** To determine whether witnesses should be precluded from testifying, courts should assess four criteria: "(1) how vital the witness is to the case, (2) whether the opposing party will be surprised, (3) whether the discovery violation was motivated by bad faith, and (4) any other relevant circumstances." *State v.* (*Joe U.*) *Smith*, 140 Ariz. 355, 359, 681 P.2d 1374, 1378 (1984).

### 1. Dr. Wu

**¶93** Under Arizona Rule of Criminal Procedure 15.2(d), a defendant must disclose witnesses forty days after arraignment or ten days after the state's disclosure. Parties have an ongoing duty to disclose new information as it is discovered. Ariz. R. Crim. P. 15.6(a). Yet less than one week before the penalty phase began, Burns provided notice that Dr. Joseph Wu, a mitigation witness, would testify regarding results of a PET scan of Burns' brain. In response, the State moved to preclude Dr. Wu's testimony and the results of the PET scan. The trial court ultimately allowed Dr. Wu to testify after Burns disclosed the reports.

**¶94** The State objected on lack-of-disclosure grounds when Burns' counsel questioned Dr. Wu about a quantitative measurement of Burns' PET scans. One week before he testified, Dr. Wu told the State he had not performed a quantitative analysis. The court ruled that the State should have the opportunity to have its expert review the PET scan findings and would not allow the line of questioning until it could be determined whether there was adequate time for the results to be examined. Ultimately, Dr. Wu was not allowed to testify about the quantitative analysis. Dr. Wu did testify at length that, in his opinion, Burns had diminished frontal-lobe activity, rendering him less culpable for his actions.

**¶95** Based on the *Smith* factors, the trial court did not abuse its discretion by precluding Dr. Wu's quantitative analysis. Dr. Wu's

testimony was not critical to Burns' defense. Dr. Wu testified at length that Burns had diminished frontal-lobe activity and explained that this could affect Burns' impulse control, judgment, and emotional regulation. Burns has not identified what the quantitative analysis would have additionally shown. Second, the prosecution was unfairly surprised by the evidence, as Dr. Wu had stated just one week earlier that he had not performed a quantitative analysis. There is no indication of bad faith, so the third *Smith* factor is inapplicable. Finally, the trial court did not preclude the testimony entirely, but instead imposed a less-burdensome alternative: it required Burns to wait to delve into the quantitative analysis until the State's expert had a chance to review it. By the conclusion of Dr. Wu's testimony, the State's expert, Dr. Waxman, had not received the data in a useable format. And Burns never attempted to recall Dr. Wu after Dr. Waxman had accessed the files. Under the *Smith* test, the trial court did not abuse its discretion by precluding the quantitative analysis evidence.

## 2. Dr. Cunningham

¶96 The court sustained an objection on non-disclosure grounds to Dr. Cunningham's direct examination testimony regarding "the rates of violence in prison, factors that are predictive of violence in prison, and how capital offenders behave in prison." At the conclusion of Dr. Cunningham's testimony, Burns' counsel said he intended to recall Dr. Cunningham as a rebuttal witness. The State objected, arguing that Burns did not disclose to the State that it intended to call Dr. Cunningham as a rebuttal witness and that Dr. Cunningham's purported testimony on the likelihood of violence in prison among capital offenders was not relevant to the State's rebuttal evidence. The trial court ruled that if the State presented evidence on the likelihood of violence in prison, "then Dr. Cunningham will be allowed to testify" as a rebuttal witness.

¶97 A few days later, a State expert, Dr. Kirkley, discussed Burns' past misconduct to support her conclusion that Burns exhibited antisocial personality disorder. Burns then moved to recall Dr. Cunningham to address antisocial personality disorder and to explain the statistical analysis on the risk of inmate prison violence based upon his own research and other research presented in Burns' case-in-chief. The trial court precluded this testimony because it "was not timely disclosed." Further, the court found that the State did not inject the issue by its questioning of Dr. Kirkley and that the offered testimony was not relevant as rebuttal evidence.

¶98 Burns' offer of proof disclosed that Dr. Cunningham would have offered a statistical analysis showing that violent offenders do not necessarily commit acts of violence while incarcerated. Burns argues that this testimony would have rebutted the "[S]tate's position that [Burns] could not be safely housed for life in ADOC" as well as Dr. Kirkley's opinion that Burns' antisocial personality disorder and history meant he had a high probability of future dangerousness in prison. We find no abuse of discretion.

¶99 Under the *Smith* factors, Dr. Cunningham's testimony that Burns could safely be incarcerated for life was cumulative and therefore not vital to his mitigation evidence. Another defense expert, James Aiken, had already testified that an inmate like Burns could be safely housed in prison. Second, the fact that Dr. Cunningham had testified in other trials does not mean that the State was prepared to effectively deal with his late-disclosed testimony in Burns' case. The fact that the State had virtually no notice that Burns intended to call Dr. Cunningham as a rebuttal witness weighs in favor of preclusion. As with Dr. Wu's testimony, there is no evidence of bad faith in the defense's late disclosure, and so the third *Smith* factor is inapplicable here.

¶100 Ultimately, Burns cannot establish that he was prejudiced by the preclusion of Dr. Cunningham's testimony because the proffered testimony was largely cumulative. We find no abuse of discretion in the trial court's refusal to allow Dr. Cunningham's rebuttal testimony.

### Q. Impeachment of Burns' Experts

¶101 Burns next argues the trial court erred by not limiting the State's cross-examination of Dr. Wu and Burns' prison expert, James Aiken. We review a trial court's ruling regarding the scope of cross-examination for an abuse of discretion. *State v. Ellison*, 213 Ariz. 116, 132 ¶ 52, 140 P.3d 899, 915 (2006).

¶102 On direct examination during the penalty phase, Mr. Aiken testified that Burns could be safely managed in the Arizona prison system. The State then cross-examined Mr. Aiken regarding recent inmate crimes and escape attempts in a private prison facility in Kingman, the murder of a detention officer inside the prison, a hostage crisis at an Arizona prison,

and other matters. The trial judge allowed the cross-examination over Burns' objection.

**¶103**        Burns also objected to the State's cross-examination of Dr. Wu regarding his evaluation of the PET scans. Burns again objected when the State asked Dr. Wu about several other cases, listed in his PowerPoint presentation, from other jurisdictions where courts precluded PET scan evidence. The trial court overruled the objection, and Dr. Wu responded that he was unsure what the courts had concluded.

**¶104**        We find nothing improper with the State's cross-examinations of Burns' experts. The cross-examinations were relevant to impeach each expert. *See* Ariz. R. Evid. 401(a) ("Evidence is relevant if [] it has any tendency to make a fact more or less probable than it would be without the evidence . . . ."); Ariz. R. Evid. 611(b) ("A witness may be cross-examined on any relevant matter.").

## R.  Jurors' Concern for Courtroom Safety

**¶105**        Burns contends the trial court violated his right to a fair trial when it denied his motions for a mistrial after the jurors expressed concern about their safety. Trial court rulings on motions for mistrial are reviewed for an abuse of discretion. *State v. Lehr* (*Lehr III*), 227 Ariz. 140, 150 ¶ 43, 254 P.3d 379, 389 (2011).

**¶106**        During the guilt-phase deliberations, the jury sent the following question to the judge:

> We are concerned about the juror's [sic] safety. In other words, are people going to be able to access our personal information—name, employer, address, etc.? Since [the] foreperson had to sign their actual name[,] will [the] foreperson be safe? Is there a way that we can keep our personal information private/safe from the public? Defendant's family etc.? We are concerned about our safety . . . also media etc.

The judge responded that the juror information would be sealed by the court and unavailable to the general public. Burns moved for a mistrial, arguing that the jurors' concern for their safety could have "played a role

in [their] deliberative process." The trial court denied Burns' motion for a mistrial.

¶107 The next day, defense counsel asked the court to question the jurors individually to ensure that their concerns would not affect their impartiality. Instead of asking each juror individually, the judge asked the jury as a group whether any juror would be unable to keep an open mind during the next phase of the trial. No juror responded.

¶108 During the penalty phase, the jurors submitted a written request asking the trial judge to ensure that a guard be posted by Burns at all times because some jurors were feeling "uncomfortable." Burns moved for a mistrial, and the judge asked defense counsel if there was a question he would like the court to ask the jury. Defense counsel responded that the court needed to follow up on the jury's question and ask each juror whether he or she was afraid of Burns and whether the courtroom security was insufficient.

¶109 The trial judge denied the mistrial motion. The court noted that one of the deputies who usually sat by Burns had to leave for a personal emergency, leaving only one deputy in the courtroom instead of two. The trial court addressed the jury and asked whether anyone could not keep an open mind based on of anything that occurred in the guilt phase. No juror responded. The trial judge planned to ask any juror who raised a hand additional questions outside the presence of the other jurors. In the penalty-phase jury instructions, the trial judge reminded the jurors that "any belief or feeling you have about courtroom security or other security matters shall not be part of your decision making process."

¶110 A trial court must ensure that the jury is capable of rendering a fair and impartial verdict. *See State v. Detrich*, 188 Ariz. 57, 67, 932 P.2d 1328, 1338 (1997). A trial court has broad discretion in selecting methods to detect and protect against potential juror bias. *See Trostle*, 191 Ariz. at 12, 951 P.2d at 877 (finding no abuse of discretion where trial court elected not to conduct individual or small-group voir dire to screen for bias).

¶111 Here, the trial court did not abuse its discretion when it denied Burns' motions for a mistrial. When the jurors raised a concern about their personal information becoming public, the court appropriately reassured them that their information would remain sealed. The court then

verified that the jurors' concern had not affected their ability to decide the case fairly and impartially. It did so again when the jurors expressed their discomfort during the penalty phase. The trial court did not abuse its discretion in addressing the issue as it did.

### S. Juror Misconduct

¶112 Burns argues that the trial court erred when it failed to declare a mistrial after Juror 11 investigated a fellow juror's anti-death-penalty political activity and shared this information with other jurors. "A trial court's decision to grant or deny a new trial based on alleged jury misconduct generally will not be reversed absent an abuse of discretion." *State v. Hall*, 204 Ariz. 442, 447 ¶ 16, 65 P.3d 90, 95 (2003). Juror misconduct warrants a new trial only if a defendant shows actual prejudice or if prejudice may be fairly presumed from the facts. *State v. Miller*, 178 Ariz. 555, 558, 875 P.2d 788, 791 (1994). Because Burns failed to raise this issue at trial, however, we review for fundamental error. *Rutledge*, 205 Ariz. at 13 ¶ 29–30, 66 P.3d at 56.

¶113 On the second day of jury deliberations in the penalty phase, Juror 11 sent a note to the judge that stated, "I believe we have a stealth juror in the jury." Juror 11 expressed concerns about Juror 2's unwillingness to deliberate and personal feelings about sexual assault. Juror 11 explained how he had taken it upon himself to research Juror 2 on the Internet and had uncovered contributions to political parties and candidates that oppose the death penalty. Juror 11 attached the results of his various Internet searches to the note he sent to the judge.

¶114 Defense counsel asked that the court talk to Juror 11 to see if he had shared the research he had conducted on Juror 2 with the other jury members. The parties and court agreed to release Juror 11 for violating the admonition after he admitted that he told a "couple of the jurors" about the information he had discovered. After dismissing Juror 11, the court called in the remaining jurors and advised them that she had dismissed Juror 11, but not to "question why that happened." The court also asked the jurors if Juror 11 had shared information about any of the other jurors with any of them. No juror responded to the question. The court then replaced Juror 11 with the last remaining alternate, Juror 17.

¶115        The next trial day, Juror 8 sent a note to the judge indicating that she had spoken with Juror 11 about the contents of his letter. The court then questioned Juror 8, who confirmed that Juror 11 had told her and other jurors what he discovered on the Internet about the "stealth juror's" views on the death penalty and political contributions. The court asked Juror 8 if she believed that she would be able to put aside that information to deliberate and decide the case solely on the evidence and jury instructions provided. Juror 8 responded, "Absolutely."

¶116        The court also questioned Juror 15, who explained that he saw Juror 11 writing his note to the judge. Juror 15 explained that Juror 11 identified the juror who was the subject of his note, but did not indicate what information he possessed. Juror 15 assured the court that he could remain fair and impartial.

¶117        The court next questioned Juror 6, who explained that throughout the trial, Jurors 2 and 11 had politically opposite views and argued a lot. Juror 6 thought that Juror 11 "wanted to remove himself from the jury" once the penalty phase began. Juror 6 explained that she did not want to know what Juror 11 told the court and that she could put the incident aside, follow the jury instructions, and decide the issues based on the evidence presented.

¶118        The court then questioned Juror 4, who heard Juror 11 explaining that he had "Googled" a member of the jury, discovering political affiliations. Juror 4 explained that he was not paying that much attention to Juror 11, that he was not concerned with what Juror 11 had found, and that he would be able to follow the jury instructions as given.

¶119        Finally, the court brought in the entire jury, explained that Juror 11 had been replaced with Juror 17, and told jurors not to worry about the reasons for Juror 11's replacement. The court explained that the jurors were still under the admonitions and that they were not permitted to do any outside research on the Internet or otherwise. The court further explained that the jury must begin the penalty-phase deliberations anew.

¶120        Burns asserts the trial court failed to adequately investigate this issue by refusing to question all twelve jurors individually and, because of the limited nature of the court's questioning, it cannot be concluded

31

beyond a reasonable doubt that the prior guilt- and aggravation-phase verdicts in the case were not coerced and were truly unanimous.

¶121 Burns, however, failed to object or otherwise raise any concerns to the trial court about its handling of this matter. After receiving Juror 11's note, the trial judge met with Burns' counsel and the prosecutor, and Burns' counsel stated that he agreed with the court's planned response. Burns' counsel only asked that Juror 11 identify which jurors he had shared the information with (Juror 11 was unable to accurately do so without using their names on the record). Counsel did not ask the court to question all jurors individually, object to the court's plan to discuss the situation with the jury as a whole, or move for a mistrial.

¶122 Burns has not established error, much less fundamental error. In *State v. Garcia*, a juror told other jurors about alleged improper contact initiated by the defendant's family during the aggravation phase of the trial. 224 Ariz. 1, 11 ¶ 29, 226 P.3d 370, 380 (2010). The trial court interviewed all the jurors, and no juror expressed a concern that the incident would affect his or her deliberations. *Id.* at 11 ¶ 30, 226 P.3d at 380. After the interviews concluded, defense counsel moved for a mistrial of the aggravation phase, which the trial court granted. *Id.* We held that the trial court did not err by failing to grant a mistrial on the already completed guilt phase because "the trial court's decision to grant a mistrial as to the aggravation phase alone was sufficient in light of the limited nature of the potential prejudice." *Id.* at 11 ¶ 31, 226 P.3d at 380. We have explained that when confronting issues of juror misconduct, "the court's response should be commensurate with the severity of the threat posed." *Id.* (quoting *Miller*, 178 Ariz. at 557, 875 P.2d at 790).

¶123 Burns cannot show error because the jurors who spoke to Juror 11 about his letter indicated to the judge that they received no specifics from Juror 11 regarding his concerns about Juror 2, and all assured the court that they had no difficulty setting aside what happened and following the jury instructions. Here, unlike the jurors in *Garcia*, the jurors remaining on the jury panel had no information regarding the content of Juror 11's letter to the court. Burns' contention that "it is now unknown" what impact Juror 11's conduct had on the remaining jurors is insufficient to demonstrate fundamental error.

### T. Sentencing on the Non-Capital Counts

¶124        Burns contends the trial court erred by refusing to sentence him on the non-capital counts within thirty days of his conviction in violation of Arizona Rule of Criminal Procedure 26.3. Burns asserts that, because he was not sentenced on his non-capital convictions, he was deprived of the right to have the jury consider his terms of imprisonment on those charges during the penalty phase. We review a trial court's interpretation of the Arizona Rules of Criminal Procedure de novo. *State v. Manuel*, 229 Ariz. 1, 3 ¶ 5, 270 P.3d 828, 830 (2011).

¶125        Under Rule 26.3, a court is obligated to sentence a defendant between fifteen and thirty days after conviction. Ariz. R. Crim. P. 26.3. But "[u]nder both Arizona's superseded and current capital sentencing schemes, a defendant's [capital] trial consists of two phases: a guilt phase and a penalty phase." *State v. Ring*, 204 Ariz. 534, 554 ¶ 50, 65 P.3d 915, 935 (2003). Thus, waiting until the end of the proceeding to determine Burns' sentences for both non-capital and capital convictions is both logical and within the plain language of Rule 26.3. We hold that, in a capital proceeding, the thirty-day sentencing period does not begin to run until after the conclusion of the penalty phase.

¶126        Burns next argues that he should have been permitted to argue to the jury that his consecutive sentences on his non-capital convictions would require him to spend the rest of his life in prison. But Burns had no right to present evidence of his effective life sentence to the jury because it would have been irrelevant as a mitigating factor. *See State v. Benson*, 232 Ariz. 452, 465 ¶¶ 52–57, 307 P.3d 19, 32 (2013) (refusing to allow defendant to present evidence that he was unlikely to be paroled or would stipulate to ineligibility for parole not an abuse of discretion); *Dann*, 220 Ariz. at 372–73 ¶¶ 122–24, 207 P.3d at 625–26 (refusing to instruct jury that defendant would waive parole eligibility if not sentenced to death not an abuse of discretion). The trial court did not err in so ruling.

### U. Evidence of Burns' Gang Affiliation, Attitude, and Other Misconduct

¶127        Burns argues that evidence of his jail calls, religious beliefs, tattoos, and gang membership were improperly admitted in violation of his First, Eighth, and Fourteenth Amendment rights. This Court reviews the admission of evidence in the penalty phase for an abuse of discretion. *State*

*v. Nordstrom*, 230 Ariz. 110, 114 ¶ 8, 280 P.3d 1244, 1248 (2012). So long as rebuttal evidence is relevant to the thrust of a defendant's mitigation and is not unduly prejudicial, we defer to the trial court's finding of admissibility. *VanWinkle*, 230 Ariz. at 394 ¶ 28, 285 P.3d at 315.

**¶128** During the penalty phase, the court admitted evidence of Burns' other acts. This included testimony regarding alleged uncharged sexual assaults committed by Burns and testimony about Burns' fifteen prior police reports, beginning when he was thirteen years old and ending with his possession of a homemade handcuff key while awaiting trial in this case. The State also offered testimony about Burns' white-supremacist views, the significance of Burns' tattoos (many of which were connected with white-supremacist gangs or ideology), and Burns' Asatru religion. The court also permitted testimony about letters and jail calls in which Burns described committing acts of racially motivated violence in prison, made derogatory comments about individuals involved in the case, and discussed his former cellmate killing someone to join Burns in prison.

**¶129** Burns argues this rebuttal evidence was irrelevant to specific mitigation evidence and the trial court erred by failing to analyze this evidence under Rules of Evidence 401–403 or 404(b). We disagree.

**¶130** The Rules of Evidence do not apply to the admission of evidence during the penalty phase of a capital trial. *Chappell*, 225 Ariz. at 239 ¶ 35, 236 P.3d at 1186; A.R.S. §§ 13–751(C), –752(G). Thus, evidence that is inadmissible during the guilt phase may be admissible during the penalty phase if it rebuts the defendant's mitigation and is not unfairly prejudicial. *See Chappell*, 225 Ariz. at 239 ¶¶ 35–36, 236 P.3d at 1186. Trial courts, however, should exclude evidence that is irrelevant in order to prevent the penalty phase from devolving into a "limitless and standardless assault on the defendant's character and history." *State v. Hampton*, 213 Ariz. 167, 180 ¶ 51, 140 P.3d 950, 963 (2006).

**¶131** Burns first contends that evidence of his prior arrests, other criminal acts, and alleged sexual assaults should not have been admitted. This evidence, however, was directly relevant to rebut Mr. Aiken's testimony that Burns would not pose a danger in the prison system and could be effectively and safely housed there. The court did not abuse its discretion in allowing this evidence.

¶132     Burns next challenges the admissibility of evidence regarding his white-supremacist beliefs. Mr. Aiken testified that, after reviewing the police reports from the department of corrections, he did not see anything to validate Burns as a gang member. Evidence of Burns' Skinhead affiliation, including his tattoos, statements of his beliefs, interest in the Asatru religion, and documentation by police as a Skinhead member, was directly relevant to rebut Mr. Aiken's testimony suggesting that Burns was not a gang member and that he could safely be controlled in prison.

¶133     Burns also contends that his derogatory comments toward the prosecutor and the State's witnesses should not have been admitted into evidence because their only purpose was "to inflame the jury." Burns described the individual who brought Mandi to court to testify as "a big fat Mexican dude," and referred to Mandi as a "race [traitor] bitch." This provides evidence of his Skinhead beliefs and rebuts Mr. Aiken's testimony that Burns could be controlled in prison because he was not a member of a gang. Burns also commented that the assistant prosecutor looked like she had "Down's Syndrome." This was evidence of Burns' anti-social behavior, supporting the findings of Dr. Kirkley.

¶134     Burns finally contends that his calls with his former cellmate were improperly admitted as evidence because the calls injected the cellmate's "behavior and attitudes" into the trial. Again, the calls were relevant because they demonstrated that Burns was involved in misconduct while incarcerated, directly rebutting Mr. Aiken's testimony that Burns could safely be managed in prison.

¶135     Because all the proffered evidence was relevant to rebut Burns' mitigation evidence, the trial court did not abuse its discretion by admitting it during the penalty phase.

## V. Victim Impact Evidence

¶136     Burns contends "[t]he trial court violated Arizona Rule of Criminal Procedure 19.1(d)" and his constitutional rights by admitting more than two hours of victim impact evidence. Burns also argues that the victim impact evidence was not admissible because some of the testimony speculated about what Jackie's final moments were like rather than describing how her murder affected her family. We review the trial court's decision whether to grant a mistrial based on the admission of victim

impact testimony for an abuse of discretion. *State v. Gallardo*, 225 Ariz. 560, 567 ¶ 26, 242 P.3d 159, 166 (2010).

**¶137**        During the penalty phase, thirteen family members either presented their own statements or had the victim's advocate read prepared statements. The State also showed an eight-minute video from Jackie's memorial services, which contained approximately 110 pictures of Jackie. The State also showed the jury Jackie's "senior project," a nine-page PowerPoint presentation containing thirteen photographs of Jackie and her written reflections on growing up. At the end of the presentation, Burns moved for a mistrial, which the trial court denied.

**¶138**        Victim impact evidence is admissible during the penalty phase of a capital trial to rebut a defendant's mitigation evidence. A.R.S. § 13-752(R); Ariz. R. Crim. P. 19.1(d)(3); *Dann*, 220 Ariz. at 369 ¶ 100, 207 P.3d at 622. "Even if victim impact statements are not offered to rebut any specific mitigating fact, they are 'generally relevant to rebut mitigation' and thus admissible in the penalty phase." *Gallardo*, 225 Ariz. at 567 ¶ 28, 242 P.3d at 166 (quoting *Garza*, 216 Ariz. at 69 ¶ 60 n.12, 163 P.3d at 1019 n.12). Although victim impact testimony may not request imposition of a particular sentence, it may properly describe the victim and the impact of the murder on family members. *Id.* at 567 ¶ 27, 242 P.3d at 167.

**¶139**        That is not to say, however, that a trial judge must permit all victim impact testimony. A trial court must exclude victim impact evidence if it is so "unduly prejudicial that it renders the trial fundamentally unfair." *Id.* at 567 ¶ 25, 242 P.3d at 166. We have repeatedly recognized the potential "danger that photos of the victims may 'be used to generate sympathy for the victim and his or her family.'" *State v. Rose*, 231 Ariz. 500, 511 ¶ 50, 297 P.3d 906, 917 (2013) (quoting *Ellison*, 213 Ariz. at 141 ¶ 115, 140 P.3d at 924). Nonetheless, we have declined to impose a per se bar on the use of photographs in victim impact presentations, instead relying on trial judges to exercise their discretion to weigh a photograph's potential for unfair prejudice against its probative value. *See id.*; *Ellison*, 213 Ariz. at 141 ¶ 115, 140 P.3d at 924. Thus, a trial judge must take an active role in reviewing victim impact evidence to screen for potential unfair prejudice. *See Rose*, 231 Ariz. at 511 ¶ 47, 297 P.3d at 917.

**¶140**        On the record before us, we cannot say that the trial court abused its discretion. The statements from Jackie's family focused on the

type of person Jackie was and the family's sense of loss. This is acceptable victim impact evidence. *Gallardo*, 225 Ariz. at 567 ¶ 27, 242 P.3d at 166. Similarly, the photos here were relatively benign, including depictions of graduations, birthdays, and vacations. The photos fell within bounds and did not render the trial "fundamentally unfair." *See id.* at 567 ¶ 28, 242 P.3d at 166. The trial court gave the jury a limiting instruction, cautioning jurors that they could consider the victim impact statements only to the extent that they rebutted mitigation and could not consider the victim impact evidence as an aggravating circumstance. Because the statements and photographs in this case were not unfairly prejudicial, and the trial court gave an appropriate limiting instruction, the court did not abuse its discretion in permitting the victim impact evidence.

**¶141** Burns' contention that victim impact statements may not speculate about how the victim may have felt during the crime is similarly without merit. We have previously held a family member's brief remarks about the impact of remembering or visualizing a victim's final moments were not unduly prejudicial. *See, e.g.*, *Glassel*, 211 Ariz. at 53 ¶ 79, 116 P.3d at 1193 (holding that victim impact statement that described how husband felt while victim begged for help was not unduly prejudicial); *Prince II*, 226 Ariz. at 535 ¶¶ 71–73, 250 P.3d at 1164 (mother's victim impact statement that described how she still hears victim crying as she was thrown across the floor not unduly prejudicial). We again caution victims and prosecutors to exercise restraint when presenting this type of victim impact evidence. But, on the record before us, we find no error. The trial court did not abuse its discretion in denying Burns' motion for a mistrial.

**¶142** Nevertheless, we are troubled with the volume and type of materials presented as victim impact evidence in this case. The jury heard more than a dozen victim impact statements, some of which came from people who had never met Jackie. Jackie's school work was displayed to the jury. While we understand the strong emotions that senseless murders generate in surviving family members and communities, we again caution victims and prosecutors about piling on impact evidence "lest they risk a mistrial." *Rose*, 231 Ariz. at 511 ¶ 47, 297 P.3d at 917. The trial court should take an active role in pre-screening the nature and scope of victim impact evidence to ensure it does not "cross the line." *Cf. id.*

### W. Penalty-Phase Jury Instructions

**¶143**         Burns contends that the trial court's penalty-phase jury instructions were erroneous in two respects.  First, Burns argues the court instructed the jury to consider in mitigation only evidence presented during the mitigation phase, and not evidence presented during other phases of the trial.  This argument is without merit.  The thrust of the challenged jury instruction was to prevent sympathy unrelated to the defendant's character, not to limit the factors that the jury could consider.  The jury was instructed that it could consider any facts that it found relevant.

**¶144**         Second, Burns argues that the jury instructions restricted the type of evidence that the jury could consider as mitigating in violation of *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Tennard v. Dretke*, 542 U.S. 274 (2004).  We disagree.  The trial court instructed the jury that it could consider any factors that "relate to any sympathetic or other aspect of the defendant's character, propensity or record, or circumstances of the offense."  We have approved similar jury instructions as complying with *Lockett*.  *See State v. Velazquez*, 216 Ariz. 300, 311 ¶ 44, 166 P.3d 91, 102 (2007).   The jury instructions in this case allowed the jury to consider any relevant mitigation evidence.  We find no error.

### X.  Prosecutorial Misconduct

**¶145**         Burns contends that the prosecutor engaged in misconduct throughout the trial, which deprived Burns of his right to due process under the Fourteenth Amendment.

**¶146**         We review a trial court's denial of a motion for mistrial for prosecutorial misconduct for an abuse of discretion.  *State v. Lehr* (*Lehr I*), 201 Ariz. 509, 522 ¶ 56, 38 P.3d 1172, 1185 (2002).  When a defendant fails to object at trial, however, "we review only for fundamental error."  *Roque*, 213 Ariz. at 228 ¶ 154, 141 P.3d at 403.  "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Hughes*, 193 Ariz. at 79 ¶ 26, 969 P.2d at 1191 (internal quotation marks and citation omitted).  We look to the "cumulative effect of the misconduct" on the trial.  *Id.*

**¶147**         The prosecutorial misconduct that Burns complains of falls into two categories: those actions that he objected to at trial, which we

review for an abuse of discretion, and those to which he did not object, which we review only for fundamental error.

### 1. Conduct objected to during trial

**¶148**  Burns objected to eight actions by the prosecutor at trial that he claims constituted prosecutorial misconduct. He argues that the prosecutor committed misconduct by (1) repeatedly eliciting testimony that this was Jackie's first date after promising to not comment on her chastity; (2) arguing without any evidence that Burns gave Jackie GHB; (3) infecting the entire penalty phase with irrelevant testimony regarding Burns' religion, white supremacist beliefs, Skinhead affiliations, and prior acts of violence and sexual misconduct; (4) showing the jury gruesome photographs of the victim's body for no substantive reason; (5) eliciting testimony that various knives were found at Burns' home despite having promised to not inquire into them; (6) commenting on Burns' refusal to answer police questions; (7) arguing in closing of both trial phases that Burns' motive for killing the victim was to prevent her from reporting him for committing sexual assault and to avoid going back to prison; and (8) arguing several times that to "do justice" required that the jury think about what Burns' conduct did to Jackie's family.

**¶149**  We have already rejected most of Burns' arguments underlying his assertion of prosecutorial misconduct. The trial court did not err in admitting, and the prosecutor therefore did not commit misconduct by commenting upon, evidence concerning Jackie's being on her first date, the presence of GHB in her liver, Burns' religious and white-supremacist beliefs, photographs of Jackie's body, the knives found in Burns' house, and the impact of Jackie's death on her family.[6]

**¶150**  Burns is also unpersuasive in contending that the prosecutor committed misconduct when (1) he elicited testimony that Burns was silent when asked after his arrest about Jackie's body, and (2) argued during closing argument that Burns killed Jackie so she would not report the sexual assault. A prosecutor may not make any comments calculated to point out a defendant's invocation of his Fifth Amendment right. *Id.* at 87 ¶ 64, 969 P.2d at 1199. This Court examines a comment on a defendant's silence in the context of the proceedings as a whole to determine whether the jury

---

[6]  *See supra* Sections F, G, U, K, J, and V.

would perceive them to be a comment on a defendant's failure to testify. *Id.* But comments and evasive answers made before invoking the right to remain silent are admissible. *See State v. Parker*, 231 Ariz. 391, 406 ¶ 65, 296 P.3d 54, 69 (2013).

¶151 Burns objects to a detective's testimony about Burns' conduct during police questioning. The detective stated that, when the police asked for the location of Jackie's body, Burns did not say where Jackie's body was located, but just got "real quiet, clos[ed] his eyes, and just sh[ook] his head." This exchange occurred before Burns invoked his right to remain silent, making the testimony admissible. *See id.*

¶152 The prosecutor did not commit misconduct by arguing that Burns murdered Jackie to prevent her from disclosing the sexual assault. A prosecutor may make arguments and may draw inferences that are reasonably supported by the evidence. *Hughes*, 193 Ariz. at 85 ¶ 59, 969 P.2d at 1197. Here, the evidence reasonably supported the prosecutor's arguments.

## 2. Conduct not objected to during trial

¶153 Burns also now claims that the prosecutor committed misconduct by (1) arguing that Jackie did not consent to sexual intercourse, (2) arguing that Burns' allocution should be given little weight because it was not under oath or subject to cross-examination, and (3) "belittl[ing] the integrity of" Dr. Cunningham.

¶154 The prosecutor's reference to Jackie's lack of consent during the guilt-phase closing argument was not misconduct because evidence supports this inference. *See supra* Section N.1. Nor did the prosecutor improperly inflame the jury by commenting in his closing that Burns treated Jackie "like trash" and has a low regard for women. Although the brief comments were unnecessary, they were supported by the evidence and, when viewed in context, were not improperly inflammatory.

¶155 Nor did the prosecutor commit misconduct by noting that Burns' allocution was not under oath or subject to cross-examination. A sentencing judge or jury may properly consider the fact that an allocution was not under oath or subject to cross-examination when weighing a

defendant's credibility. *State v. McCall*, 160 Ariz. 119, 124, 770 P.2d 1165, 1170 (1989).

**¶156** Finally, Burns has not shown that the prosecutor committed misconduct by "belittl[ing]" Dr. Cunningham. It is improper for a prosecutor to argue, without evidentiary support, that an expert acted unethically. *State v. Bailey*, 132 Ariz. 472, 479, 647 P.2d 170, 177 (1982); *see also Hughes*, 193 Ariz. at 86 ¶ 61, 969 P.2d at 1198 (holding that "arguing that all mental health experts are fools or frauds who say whatever they are paid to say" was prosecutorial misconduct). However, a prosecutor may properly inquire into an expert's credentials and employment for impeachment purposes. *Bailey*, 132 Ariz. at 478, 647 P.2d at 176. Here, the State argued that the jury should give little weight to Dr. Cunningham's testimony because he (1) did not interview the defendant, yet was willing to opine as to a causal link between mitigating factors and the murder; and (2) is exclusively employed as an expert witness and does not have a clinical practice. The prosecutor did not impugn Dr. Cunningham's integrity, but merely questioned his credentials and familiarity with this case.

**¶157** Because we have found no prosecutorial misconduct, we need not analyze whether any errors deprived Burns of a fair trial or whether he suffered any prejudice.

### Y. Jury Coercion

**¶158** Burns contends that the trial court coerced a death verdict when it granted a break over the weekend and required further deliberations after the jury advised the court that it was deadlocked. "In determining whether a trial court has coerced the jury's verdict, this court views the actions of the judge and the comments made to the jury based on the totality of the circumstances and attempts to determine if the independent judgment of the jury was displaced." *State v. Huerstel*, 206 Ariz. 93, 97 ¶ 5, 75 P.3d 698, 702 (2003). Improperly coercing a verdict from the jury constitutes reversible error. *State v. McCrimmon*, 187 Ariz. 169, 172, 927 P.2d 1298, 1301 (1996).

**¶159** On February 15, 2011, at 3:51 p.m., the jury began penalty-phase deliberations. Deliberations continued for approximately a day and a half before the jury had to restart deliberations when the trial judge

dismissed Juror 11 and substituted an alternate juror.[7] On February 22, the newly composed jury began deliberations. On the afternoon of February 23, the jury notified the court that it could not reach a unanimous verdict, and the trial court gave an impasse instruction. One juror responded to that instruction by saying that more information would be helpful. Burns moved for a mistrial, and the trial court denied that motion. The jury resumed deliberations. Later in the afternoon, the trial court asked if any of the jurors would object to recessing for the day and returning to deliberate on Monday. Some jurors indicated that they felt it would be pointless, but two responded that taking the weekend to "cool off" would be helpful. The trial court again denied Burns' motion for a mistrial. The following Monday afternoon, the jury returned a death verdict.

**¶160** We have held that "[j]ury coercion exists when the trial court's actions or remarks, viewed in the totality of the circumstances, displaced the independent judgment of the jurors or when the trial judge encourages a deadlocked jury to reach a verdict." *Davolt*, 207 Ariz. at 213 ¶ 94, 84 P.3d at 478 (internal quotation marks and citations omitted). Whether jury coercion occurs is fact intensive and requires a case-by-case analysis. *State v. Roberts*, 131 Ariz. 513, 515, 642 P.2d 858, 860 (1982) (citations omitted). A trial judge may coerce a verdict by focusing jury instructions on a holdout juror in a way that suggests that the juror should reconsider his or her views. *Huerstel*, 206 Ariz. at 100–01 ¶ 23, 75 P.3d at 705–06.

**¶161** With these principles in mind, we conclude that the trial court did not coerce a verdict. After it began deliberations anew, the reconstituted jury had deliberated for only one and one half days when it advised the court it was deadlocked. The court gave the impasse instruction after which the jury continued to deliberate. When the jury had not reached a decision by the weekend break, the judge asked if continuing deliberations after the weekend might help. Some jurors thought that taking a break and having the jury reconvene would be helpful.

**¶162** The court never forced the jury to come to a consensus. The judge never knew how near the jury was to reaching a unanimous verdict or whether they were leaning toward a life or death verdict. The trial judge also did not know who the holdout juror or jurors were and did nothing to get the holdouts to change their votes. We find no coercion.

---

[7]     *See supra* Section S.

**Z. Death Verdict**

**¶163** The jury found two aggravating circumstances in Burns' case: the murder was especially cruel under A.R.S. § 13-751(F)(6), and Burns had previously been convicted of a serious offense under A.R.S. § 13-751(F)(2). Regarding the aggravating circumstances, Burns contends that (1) "substantial evidence did not support the jury's verdicts on the (F)(6) aggravating circumstances"; (2) "[t]he (F)(2) aggravator was entitled to minimal weight"; and (3) the jury abused its discretion by imposing a death sentence.

**¶164** We "review all death sentences to determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death." A.R.S. § 13-756(A). A jury does not abuse its discretion in reaching a death verdict "if there is 'any reasonable evidence in the record to sustain' those conclusions." *Villalobos*, 225 Ariz. at 83 ¶ 41, 235 P.3d at 236 (quoting *State v. Morris*, 215 Ariz. 324, 341 ¶ 77, 160 P.3d 203, 220 (2007)).

**1. The (F)(6) aggravator**

**¶165** Under A.R.S. § 13-751(F)(6), a jury must consider whether the defendant committed the murder in an especially cruel, heinous, or depraved manner. A.R.S. § 13-751(F)(6). We have explained that "[a] murder is especially cruel under A.R.S. § 13–751(F)(6) when the victim consciously 'suffered physical pain or mental anguish during at least some portion of the crime and [] the defendant knew or should have known that the victim would suffer.'" *Dixon*, 226 Ariz. at 556 ¶ 61, 250 P.3d at 1185 (quoting *Morris*, 215 Ariz. at 338 ¶ 61, 160 P.3d at 217).

**¶166** There was substantial evidence supporting a finding that Jackie was conscious and that she suffered mental and physical pain. The skull fractures, blood and earring in Burns' truck, as well as Jackie's ripped bra and top all suggest a struggle and sexual assault. *See State v. Amaya-Ruiz*, 166 Ariz. 152, 177, 800 P.2d 1260, 1285 (1990); *State v. Schackart*, 190 Ariz. 238, 249, 947 P.2d 315, 326 (1997). The blood spatter and the bullet found in the sand established that Jackie was shot after being taken out of the truck. When her body was found, she appeared to be clutching a branch, which further suggests that she was still conscious when she was shot and would have been aware of what was happening to her. *See Prince II*, 226 Ariz. at 540 ¶ 98 n.7, 250 P.3d at 1169 n.7; *State v. Hargrave*, 225 Ariz.

43

1, 17 ¶ 72, 234 P.3d 569, 585 (2010). Burns knew or should have known that his actions would cause Jackie to suffer. Therefore, reasonable evidence in the record supports the jury's conclusions that the murder was especially cruel. The jury did not abuse its discretion when it found the (F)(6) aggravator.

## 2. The jury's application of the (F)(2) aggravator

¶167　　　Under A.R.S. § 13-751(F)(2), an aggravating circumstance exists if:

> [T]he defendant has been or was previously convicted of a serious offense, whether preparatory or completed. Convictions for serious offenses committed on the same occasion as the homicide, or not committed on the same occasion but consolidated for trial with the homicide, shall be treated as a serious offense under this paragraph.

Thus, convictions for crimes that occurred contemporaneously with the capital offense may be considered for (F)(2) purposes. *State v. Carreon*, 210 Ariz. 54, 66 ¶ 59, 107 P.3d 900, 912 (2005).

¶168　　　Burns argues that, because his two prior burglary convictions were non-violent offenses, the jurors should have given the (F)(2) aggravator little consideration. Burns does not contend, however, that the State failed to prove that he had two prior convictions for burglary or that he was contemporaneously convicted of sexual assault and kidnapping. The jury found the (F)(2) aggravator. Having made this finding, it was up to each juror to individually consider the aggravator in light of the mitigation presented. *State ex rel. Thomas v. Granville* (*Baldwin*), 211 Ariz. 468, 472–73 ¶ 17–18, 123 P.3d 662, 666–67 (2005). We do not find an abuse of discretion in applying the aggravator.

## 3. The death verdict

¶169　　　The jurors did not abuse their discretion in determining that the mitigating evidence was insufficient to warrant leniency. During the penalty phase, Burns presented mitigation evidence regarding his difficult childhood, his dysfunctional family, his diagnosed learning disabilities, his impulsivity, the personality disorders from which he suffered, and whether he would be able to be safely housed in prison while serving a life sentence.

¶170        "We must uphold a jury's determination that death is the appropriate sentence if any 'reasonable juror could conclude that the mitigation presented was not sufficiently substantial to call for leniency.'" *State v. Naranjo*, 234 Ariz. 233, 250 ¶ 89, 321 P.3d 398, 415 (2014) (quoting *Gallardo*, 225 Ariz. at 570 ¶ 52, 242 P.3d at 169).  Even if we assume that Burns proved all his proffered mitigating factors, we cannot say the jurors abused their discretion in concluding that the mitigation did not warrant leniency.

### III.    CONCLUSION

¶171        For the reasons stated we affirm Burns' convictions and sentences, including his death sentence.[8]

---

[8]        Burns raises thirty-two additional constitutional claims that he acknowledges this Court has previously rejected but that he wishes to preserve for federal review.  We decline to revisit these claims.