NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

BARBARA CENITE; BARBARA CENITE,
as parent and natural guardian
for her minor son, DOLUN CENITE,
*Plaintiff/Appellant*,

*v.*

CITY OF PHOENIX, an Arizona municipality,
*Defendant/Appellee.*

No. 1 CA-CV 15-0136
FILED 6-21-2016

Appeal from the Superior Court in Maricopa County
No. CV2009-037121
The Honorable John Christian Rea, Judge

**AFFIRMED**

COUNSEL

Treon & Aguirre, PLLC, Phoenix
By Richard T. Treon
*Co-Counsel for Plaintiff/Appellant*

Treon & Shook, PLLC, Phoenix
By Daniel B. Treon
*Co-Counsel for Plaintiff/Appellant*

Iafrate & Associates, Phoenix
By Michele M. Iafrate
*Counsel for Defendant/Appellee*

---

**MEMORANDUM DECISION**

Presiding Judge Diane M. Johnsen delivered the decision of the Court, in which Judge Randall M. Howe and Judge Andrew W. Gould joined.

---

J O H N S E N, Judge:

**¶1** This is an appeal from a judgment entered in favor of the City of Phoenix following a jury verdict on a personal injury claim based on alleged negligent road design. For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

**¶2** One day in 2008, while Barbara Cenite ("Cenite"); her husband, Gerald Bradley Cenite; her son, Dolun Cenite; and her son's friend were traveling eastbound on Carefree Highway, a car made a left turn in front of them. Although Mr. Cenite attempted to brake, he could not avoid hitting the car, and the crash caused injuries.

**¶3** The Cenites sued the City of Phoenix, alleging negligence in the design, installation, construction and maintenance of the intersection of Carefree Highway and 27th Drive, where the accident occurred. Following a jury verdict in favor of the City, Cenite moved for new trial. The superior court denied the motion. Cenite timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes 12-2101(A)(1), (5)(a) (2016).[1]

## DISCUSSION

### A. Standard of Review.

**¶4** We review the superior court's evidentiary rulings for a clear abuse of discretion; we will not reverse unless unfair prejudice resulted or the court incorrectly applied the law. *See Gemstar Ltd. v. Ernst & Young*, 185 Ariz. 493, 506 (1996); *Conant v. Whitney*, 190 Ariz. 290, 292 (App. 1997). We view the evidence "in the light most favorable to the proponent,

---

[1] Absent material revision after the relevant date, we cite a statute's current version.

maximizing its probative value and minimizing its prejudicial effect." *State v. Kiper*, 181 Ariz. 62, 66 (App. 1994).

## B. Preclusion of Expert Testimony.

**¶5** Cenite first argues the court abused its discretion by preventing her highway design expert, Dr. Robert Bleyl, from testifying about the particulars of what Bleyl opined would have been a safer design for the intersection in which the accident occurred.

**¶6** Bleyl's expert report asserted the intersection was negligently designed because it lacked a "positive offset," meaning that a driver waiting to turn left could not get a good view of oncoming traffic. He opined that another consequence of the design was that it required a left-turning driver to take a wide turn, exposing the driver to oncoming traffic for a longer time than if the intersection was designed to have a positive offset.

**¶7** In July 2014, the City moved in limine to preclude evidence that a positive offset could have been created at the intersection by painting the street to redirect left-turn traffic closer to the center of the street. Although the City argued Cenite had not timely disclosed such evidence, in response, Cenite argued she had disclosed a diagram by Bleyl that showed such a line (called a "carrot" because of its long triangle shape) painted on the street to direct a left-turning driver closer to the median.

**¶8** The court found Cenite had disclosed Bleyl's diagram, but noted that neither Bleyl's report nor Cenite's disclosure statements specifically mentioned carrots, channelization (another term used to describe how to move left-turning traffic toward the center) or lane striping. The court further found that when the City deposed Bleyl, he said nothing about a painted line or "carrot." At argument, the City's lawyer acknowledged she did not ask Bleyl to elaborate about his proposed safer design, explaining, "Because if you look at the safer design, I think Mr. Bleyl might have been confused as to what that might encompass, so I didn't feel the need to have to address that with him."

**¶9** Cenite argues she should not have been penalized because the City deliberately did not examine Bleyl about his safer design. Although the City's explanation for its failure to ask Bleyl about his safer design is questionable, the court found that Bleyl had the opportunity to address line striping during the deposition but never did:

> [T]here were numerous places in the deposition where questions were asked of Dr. Bleyl that were sufficient that if

Dr. Bleyl possessed the opinion that either of these two, channelization or lane striping, were defects in the intersection, he should have mentioned it. That his failure to mention it at all in the course of the questioning in the deposition indicates that he either had the opinion and failed to disclose it when he should . . . or he didn't have [the opinion].

¶10 We need not decide whether the court abused its discretion in granting the motion in limine because Cenite cannot show that the ruling prejudiced her. Cenite's negligence claim required proof that the City's intersection design was unreasonably dangerous. Although the court barred her from offering evidence about how lane striping or "carrots" could have created a positive offset in the intersection, Cenite needed to show only that the intersection was negligently designed, not how to make the intersection safer.

¶11 The court's order did not prevent Bleyl from describing to the jury how the City's design was unreasonably dangerous because it resulted in a negative offset, not a positive offset. As Bleyl testified:

There are several factors. The one I was just referring to has to do with the travel distance that she has to travel in order to clear the oncoming traffic. . . .

\* \* \*

In order for [the left-turning driver] to make this turn from this lane and go clear over and clear the curb line, she has to travel roughly a hundred feet. And at the typical turning speed, 10, 15 miles per hour, to cover a hundred feet, traffic that's coming at her that's going to be a danger to her, anything closer than about 400 to 500 feet up the roadway is going to arrive before she clears the intersection.

Bleyl also explained how the negative offset impeded a left-turning driver's sight line:

That is the vehicle is – it's blocking your view . . . you can't see past it. If we were moved over to the left and it were moved up to the right so that we could see down the left side of that vehicle and see the roadway beyond, that would be called a positive offset. That's desirable. Negative offset is undesirable.

4

Asked whether the negative offset was a design defect, Bleyl responded: "It is undesirable, it's a design defect, and it's contrary to the design plans that the City of Phoenix was using at that particular time to approve left turn lanes."

¶12　　　　Moreover, before closing argument, Bleyl testified again and explained that a positive offset could have been created by narrowing the median so that a left-turning driver could be directed closer to a location with better visibility. At closing, Cenite's counsel showed the jury Bleyl's safer design diagram and explained how to create positive offset: "This is what Dr. Bleyl indicated to you, a safe design standard would be. It would involve a vehicle here, vehicle here, and a four-foot wide median, and position in traffic such that you could see right around[.]" Furthermore, the City's expert, Dr. Jim Lee, testified he agreed that a positive offset could be created by narrowing the median, thereby allowing left-lane traffic to move over far enough so that the left-turn driver's visibility is unimpaired. Asked about the merits of a positive offset design, he stated, "I would not agree that it's the safest. We hope it is. . . . Intuitively, I think it's safer."

¶13　　　　Lee's testimony, along with Bleyl's, was sufficient to provide the jury with information about the desirability of a positive offset at the intersection. Although evidence about "carrots" and "line striping" would have informed the jury about how a road design could create the desired positive offset, such evidence was not required to understand that a design with a negative offset could be unreasonably dangerous, particularly when the City did not contend it would have been impossible to create a positive offset at that location. Accordingly, Cenite cannot show how granting the City's motion in limine prejudiced her.

## C. One-Expert Rule.

¶14　　　　Cenite next argues the court abused its discretion by allowing the City to call both Lee, its retained expert, and another witness, Kerry Wilcoxon, in violation of Arizona Rule of Civil Procedure 26(b)(4)(D), which provides that, "[i]n all cases . . . each side shall presumptively be entitled to only one independent expert on an issue, except upon a showing of good cause."

¶15　　　　The City sought to have Wilcoxon testify about the safety performance of the intersection and the City's standard design guidelines for medians. At trial, Cenite objected to allowing Wilcoxon to testify about the City's design standards, arguing that Lee already had provided expert testimony on behalf of the City about those same issues.

[Court]: Isn't this [exhibit] the one Bleyl testified about?

[Cenite]: Yes, Your Honor. It's also the one that you wouldn't let me call Heidi Young to testify about, whose [sic] the one who actually identified it and who was here in 2002 and 2004 when this was the applicable design standard. [Wilcoxon] wasn't even here then. He didn't come until 2004, after the intersection has been approved. [City's counsel is] basically using him now as a clean-up person without any disclosure that he's going to testify to try to rebut Bleyl. This is Dr. Lee's area of expertise.

[Court]: [Toward counsel for the City] Given your introduction, I mean you have a design expert, you have a reconstructionist. I mean, you're going to be asking him stuff that's not his personal knowledge but giving opinions, right?

[City]: I'm a little bit confused what [counsel for Cenite is] arguing and what you're saying. There's a difference between what Mr. Wilcoxon and what Mr. Lee are going to testify to. He's our City of Phoenix expert. Hedi Young was not our City of Phoenix expert. He's going to testify as to what this document is. Bleyl had his opinion as to what this document was.

[Cenite]: Your honor, this is two experts on one issue, and I object to him being able to testify about this.

\* \* \*

[Court]: Overruled.

¶16 The City contends that Wilcoxon, a City employee, was designated to testify on behalf of the City pursuant to Arizona Rule of Civil Procedure 30(b)(6), not as an independent expert. It contends that under *Ariz. Dep't of Revenue v. Superior Court*, 189 Ariz. 49 (App. 1997), Wilcoxon cannot be considered an independent expert because he is a City employee.

¶17 In *Arizona Department of Revenue*, we held that the party's employee was not an independent expert within the meaning of Rule 26. 189 Ariz. at 50. Interpreting a previous version of Rule 26(b)(4)(D), we determined the "one independent expert" limitation did not preclude a party from calling both an independent expert and an employee to give expert testimony. By the same reasoning, because Wilcoxon is an employee

of the City, not an expert retained to provide an expert opinion, the court did not abuse its discretion in overruling the objection to his testimony.

¶18 Cenite also asserts that Wilcoxon's testimony was improper because he had no knowledge of the relevant City standards at the time the intersection was constructed, nor did he have anything to do with the review or approval of the planning of the intersection. Wilcoxon, a City employee for nearly 11 years, served as the City's director of safety and neighborhood traffic. His job duties included analyzing traffic-crash data. Wilcoxon also explained the City's record-keeping process and typical design guidelines. Although he did not remember reviewing the design of the intersection at which the accident occurred, he confirmed that the City approved the design. On this record, the court did not err in allowing in Wilcoxon's testimony.

## D. Subsequent Remedial Measures.

¶19 Cenite also contends that because Wilcoxon was allowed to testify that the design of the intersection was not defective, she should have been able to call a witness to impeach him with evidence that after the accident, the City modified the intersection to establish a positive offset for left-turning drivers.

¶20 Under Arizona Rule of Evidence 407, evidence of subsequent remedial measures is not admissible to prove negligence or culpable conduct, but "the court may admit this evidence for another purpose, such as impeachment . . . ." Cenite contends "Wilcoxon was allowed to render his opinion that the roadway was entirely safe at the time of the accident based on his post-accident inspection." Although Wilcoxon testified the intersection was operating safely at the time of the accident, he did not assert it was "entirely safe." During cross-examination, Wilcoxon testified that the intersection was performing as safely as other similar intersections:

> [Counsel]: And you concluded it was a perfectly safe intersection, didn't you?
>
> [Wilcoxon]: I wouldn't characterize it as that. I said the intersection was performing safely. Any time you have vehicles crossing paths, or even vehicles driving the same direction, you have the potential for wrecks. But it was – from an engineering design standpoint, I concluded that it was operating safe and was operating within or below actually the ranking and – or I shouldn't say the ranking but the crash performance of other similar intersections.

¶21          Following this testimony, Cenite moved to allow evidence of subsequent remedial measures the City took to enhance the safety of the intersection.  After considering the request, the court found that none of the Rule 407 exceptions applied.

> There is . . . none of the exceptions in the rule that would apply to letting them in.  [Wilcoxon's] testimony is . . . intended to address the Plaintiff's witness' testimony regarding their personal observations of lines of sight and what they could observe.  In that limited sense, it does not - it addresses plaintiff's witnesses, and the question is, is it unfair to allow that testimony without opening the door to all the others.  The Court finds that it is not - that this testimony does not open the door to broader testimony that would not be otherwise admissible.  You can certainly question him about his personal observations and the circumstances in which he made them.

¶22          Evidence of subsequent remedial measures is admissible for impeachment purposes when "the defendant goes beyond stating that the original condition was safe or adequate, and attempts to make exaggerated claims that the condition was the safest possible."  *Johnson v. State, Dep't of Transp.*, 224 Ariz. 554, 559, ¶ 23 (2010) (quotation omitted).  Although Wilcoxon did testify the intersection was operating safely, his statements did not amount to an exaggerated claim regarding the safety of the intersection.

¶23          "The overarching purpose of Rule 407's 'impeachment' provision is to allow a party to refute evidence that, if left uncontroverted, would create an unfair advantage or misleading impression for the other party who seeks to exclude any evidence of subsequent measures."  *Id.* at 560, ¶ 25.  Accordingly, evidence of subsequent remedial measures is admissible for impeachment under Rule 407 only if it contradicts a party's statements.  *See id.*  In this case, Wilcoxon had not testified that the intersection was designed in the safest way possible or that it could not have been designed any more safely.  Thus, evidence of subsequent remedial measures would not have contradicted Wilcoxon's comments.  Instead, such evidence would have allowed Cenite to prove the elements of negligence by way of subsequent remedial measures, which "directly contradicts the assumptions that support the general rule . . . ."  *Id.* at 560, ¶ 25, n.3 (quotation omitted).

**E.      Preclusion of Deposition Testimony.**

¶24      Cenite also argues the superior court abused its discretion in denying her request to offer deposition testimony of two City employees, Heidi Young and Jason Turnbaugh.  Cenite said she wanted to read their depositions because Turnbaugh identified Young as the City employee who approved the design of the intersection.  As the court noted, however, Young denied having anything to do with the approval of the design.  Cenite, however, persisted:

> It's my position the jury should have the opportunity to hear her testimony in order to be able to compare it to what Turnbaugh is saying about who approved or didn't approve of this design, because to this day we still don't know who within the City did the approval or disapproval of that design.

¶25      Before ruling, the court confirmed the City had disclosed its design manual (which identified a policy against negative offsets and discussed proper median widths) and that Bleyl would be able to testify about the City's design standards, based on the City's disclosures.  Accordingly, the court found Young's deposition not relevant:

> [B]ecause the City did not produce [Young] to speak for the City on the design standards and . . .  the plaintiff has adequate proof because they got the manual, and Dr. Bleyl is willing to say this is the City's manual and here's what it says and I rely on that, then the plaintiff's not prejudiced and it's probably not fair to the City to allow Heidi Young to put words in their mouth when they didn't produce her to say that.  And then her description of the process is really irrelevant.

¶26      Cenite argues the court should have allowed Turnbaugh's and Young's testimony to be read because it related to the City's standard of care.  But as the court found, Bleyl could testify about the City's standard of care.  Although Cenite argues that without Turnbaugh's and Young's deposition testimony, Bleyl could not testify that the City violated their own standard, the record does not support her contention.  On more than one occasion, Bleyl testified that the City of Phoenix did not conform to its own design standards in constructing the intersection.

¶27      Cenite further contends the court abused its discretion when it limited her examination of Michael Cynecki, a City employee whom

9

Cenite wanted to question about the City's policy on negative offsets. The court ruled Cenite could not ask questions of Cynecki that went "beyond his background." The City objected to the proposed examination, arguing Cynecki was "not authorized to offer opinions on behalf of the City of Phoenix." The court allowed Cenite to examine Cynecki, but ruled that any question asking him to "express an opinion that would be attributable to the City of Phoenix as to the safety or design features would be subject to objection." As it turned out, Cynecki testified he did not recall his involvement in the intersection design.

¶28　　　　Even if the court erred by limiting questioning of Cynecki, Cenite cannot show prejudice. Before ruling, the court confirmed that Cenite had the relevant information regarding the City's standard of care, and it verified that Bleyl had sufficient facts on which to form an opinion about whether the City adhered to its standard of care. Under these circumstances, we affirm the court's ruling.

**F.　　　Lack-of-Notice Defense.**

¶29　　　　Cenite further contends the court erred by allowing the City to offer evidence regarding the City's lack of knowledge of the dangerousness of the intersection. Cenite correctly asserts that to prevail on her claim of negligent design, she was not required to show the City knew the intersection was dangerous. *See Isbell v. Maricopa County*, 198 Ariz. 280, 283, ¶ 12 (2000) ("[A] plaintiff need not establish 'notice' if a government agency itself creates or causes the dangerous condition.").

¶30　　　　During the City's mini-opening, it explained that Wilcoxon would testify that the City had not received any notice of any safety concerns at the intersection. Cenite immediately moved for mistrial, arguing that no legal basis existed for the City to argue that notice was an element of the negligence claim. The court denied the motion, stating that the jury would be instructed on the law. Cenite objected again during the City's opening statement and the court again responded that the jury would be instructed on the law at the end of the case.

¶31　　　　Cenite does not cite any instance in which the court allowed the City to argue that notice was an element of the Cenite's negligence claim, nor does she identify any instance where the court appeared to endorse the view that Cenite needed to prove notice. Moreover, the court did not allow the City to examine Wilcoxon about notice:

[Court]: Bleyl testified about a number of accidents. So he's certainly entitled to testify about that. What's the relevance of making this the fourth safest? What's the relevance of that?

[City]: For example, the report that I'm showing now, the MAG report, it has the safety ranking of this intersection and three years prior to the collision.

[Court]: What's the relevance of that?

[City]: The relevance is it shows the City of Phoenix had no idea that it was an unsafe intersection.

[Court]: Well, that's – what's that relevant to?

[City]: It's notice issue -

[Court]: Failure to meet standard care, notice is not required. They designed it; they approved the design. It's – that's enough notice.

[City]: I accept that argument coming from the Court. However, if plaintiff's counsel is going to continue to argue that this intersection has evolved over time and therefore the city should have known that the design became unsafe at some point, then notice has to become an issue.

[Court]: Bleyl's testimony is negative offset, has always been.

\*　　\*　　\*

[Court]: Let's – what else is it relevant to?

[City]: It's only relevant to notice, Your Honor.

\*　　\*　　\*

[Court]: And that's not required.

¶32　　　　The jury was never instructed that it would be required to determine whether the City had notice that the intersection was dangerous. Because the jury was properly instructed, and the court never endorsed the view that notice was an element of Cenite's claim, the court did not err in denying counsel's motion for mistrial.

**G.     Hearsay Statements.**

**¶33**          Cenite argues the court erred in excluding, on hearsay grounds, statements by Ashley Smith, the left-turning driver who collided with the Cenites.  Cenite argues the testimony should have been allowed under the residual exception to the hearsay rule, Arizona Rule of Evidence 807.

**¶34**          Although Smith gave three post-accident interviews, she was not available to testify at trial.  The court granted Cenite a continuance to secure deposition testimony from Smith and her sister, who was in the car with her at the time of the accident, but Smith refused to cooperate.  Although counsel traveled to California, where he believed Smith was living, he was unable to meet with her because Smith's father refused to verify her whereabouts.  Consequently, Cenite moved pursuant to Rule 807 to admit Smith's statements.  In response, the City argued that Smith's statements did not meet the circumstantial guarantees of trustworthiness required by Rule 807.

**¶35**          Pursuant to Rule 807, hearsay that does not fall under any exceptions may be admitted if:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness;
>
> (2) it is offered as evidence of material fact;
>
> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
>
> (4) admitting it will best serve the purposes of these rules and the interests of justice.

Under this rule, an out-of-court statement must have "equivalent circumstantial guarantees of trustworthiness . . . ." *State v. Burns*, 237 Ariz. 1, 20, ¶ 69 (2015).  In deciding whether a statement is trustworthy, we consider, among other things, "the spontaneity, consistency, knowledge, and motives of the declarant . . . to speak truthfully . . . ." *Id.* (quotation omitted).  Following argument, the court found that Smith's statements to the investigator did not "provide anything close to guarantees of trustworthiness equivalent to the recognized exceptions to the hearsay rule."

¶36    Police interviewed Smith the day of the accident, and a City investigator interviewed her twice thereafter. She made inconsistent statements about whether a left-turning driver was in the opposite lane (directly across the intersection from her). When police interviewed Smith on the day of the accident, she said no car was waiting to make a left turn on the opposite side of the street facing her as she waited to turn left. In a second interview by a City investigator about six months later, however, Smith said a minivan or SUV may have been in the opposing left-turn lane. In a follow-up interview with the investigator, Smith again said an SUV was in the left-turn lane across from her. With Cenite's motion to admit Smith's statements, Cenite included the report by the City investigator, who stated:

> [W]hen I asked [Smith] why she did not see the Cenite vehicle, she mentioned that an SUV that was stopped in the eastbound left turn lane, and also the high speed at which the [Cenite vehicle] was traveling. I sensed, although this is speculation, that she may have been counseled by someone about how she should respond to my inquiries in this regard.

Moreover, Smith's sister told both the officer and the City investigator that no car was in the opposing left-turn lane. The court also found Smith and her sister to have "strenuously resisted efforts by the Plaintiffs to depose them or have them appear at trial."

¶37    The court found Smith's statements lacked sufficient trustworthiness to be allowed under Rule 807. It held it would be "contrary to the interest of justice for this case to be determined by the parties arguing inferences from ambiguous, inconsistent, and contradictory hearsay statements from witnesses who have repeatedly manifested their intention to avoid giving sworn testimony."

¶38    On this record, we cannot conclude the court erred in finding that the statements did not have the required circumstantial guarantees of trustworthiness. Moreover, even if the court had abused its discretion in denying Cenite's motion, she has not demonstrated prejudice.

¶39    Cenite's theory of liability was that the intersection's negative offset had two necessary consequences – the sight obstruction and the increased distance a left-turning driver needed to travel to get through the intersection. Thus, even without Smith's statement that another driver was waiting in the opposite left-turn lane, the jury still could find the

intersection was negligently designed because it required left-turning drivers to travel a longer distance. As counsel explained to the jury:

> [G]ranted there is no evidence, per se, of any vehicle over here that blocked Ashely Smith's view on the day of the accident. That doesn't decide the case one way or the other. That just simply means we weren't able to prove to you what might have happened out there.

Additionally, counsel used the testimony of Erin Maw, a witness to the accident, to allow the jury to infer that another vehicle had obstructed Smith's vision.

> Erin Maw told you, "I thought she was confused." Why was she confused? We don't know because we never heard from her. But you can look at the intersection and figure it out for yourself why a left-turning vehicle might be – driver might be confused about what's going on at that intersection, particularly on a busy Sunday afternoon[.]

On this basis, the jury could have decided another driver obstructed Smith's view. Accordingly, because the jury heard evidence to support both of Cenite's theories of causation, Cenite cannot show prejudice.

**H.    Deprivation of Right to Trial.**

¶40        Cenite finally argues that the court erred in denying her motion to clarify the status of her son, Dolun, in the lawsuit. She contends the court was deprived of jurisdiction over Dolun's claim when it decided "that Barabara Cenite should be the sole Plaintiff, making no mention of Dolun even though he was over eighteen years of age." Cenite, however, filed suit on behalf of Dolun, first as his parent and then as his temporary guardian when he turned 18. Cenite notified the court when she was appointed Dolun's temporary guardian, and she asked the court to amend the caption of the posting on the courtroom door to reflect the change in status. In response, the court agreed to modify the posting to indicate that "Barbara Cenite on behalf of Dolun Cenite is the Plaintiff and the only Defendant is City of Phoenix." Accordingly, the record does not support Cenite's contention that she was not allowed to appear as the legal representative for Dolun.

**CONCLUSION**

**¶41**        For the foregoing reasons, we affirm the judgment entered in favor of the City and the superior court's order denying the motion for new trial.



**Ruth A. Willingham** · Clerk of the Court
FILED: AA