NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

DANNY ANGEL VARGAS, *Appellant.*

No. 1 CA-CR 18-0662
FILED 9-10-2020

Appeal from the Superior Court in Maricopa County
No. CR2015-001817-001
The Honorable Christopher A. Coury, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael Valenzuela
*Counsel for Appellee*

The Stavris Law Firm PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant*

_____

**MEMORANDUM DECISION**

Judge Kent E. Cattani delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Jennifer B. Campbell joined.

_____

**C A T T A N I**, Judge:

**¶1**         Danny Angel Vargas appeals his conviction of first-degree murder and the resulting sentence. For reasons that follow, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

**¶2**         On July 16, 2014, Vargas shot and killed J.S. at an apartment complex. Vargas is a member of a criminal street gang in south Phoenix. J.S. had allegedly disrespected "Mongo," a senior member of the same gang, by "flashing" a gun at him. Vargas murdered J.S. in retaliation.

**¶3**         Mongo directed drug trafficking and other illegal activity at the apartment complex where the crime occurred. J.S. lived at the complex and sold drugs for Mongo. On the day of the murder, Vargas was present as J.S. and Mongo argued after Mongo told J.S. to move out because he owed Mongo money for drug sales. Mongo and Vargas left after the argument, but later returned and searched for J.S. When Vargas and Mongo found him, J.S. put his hands in his shirt, flashing a gun at Mongo. The parties then went their separate ways, and shortly thereafter, J.S. met Mongo, Vargas, and a few others in the parking lot. Moments later, Vargas killed J.S. by shooting him 14 times with a 9mm semi-automatic handgun.

**¶4**         Vargas's cousin R.L., who had been dating J.S. for a few months, was in Mongo's apartment at the complex at the time of the shooting. R.L. saw the earlier arguments between Mongo and J.S., and about a week after the murder, she reported to the police that she saw Vargas kill J.S. She confirmed her report in subsequent interviews with detectives.

**¶5**         At trial, however, R.L. testified that she did not see Vargas shoot J.S. She said that she was under the influence of methamphetamine at the time of the shooting and that her prior statements could not be trusted. She also said she feared for her safety due to testifying and was concerned about Vargas because he is her "family." The State introduced into evidence R.L.'s prior statements inculpating Vargas.

¶6          A few days after the murder, I.L. and Vargas were at Mongo's house, and I.L. heard Vargas say that he went to J.S.'s apartment with Mongo to get money J.S. had made selling drugs for Mongo. Vargas described the arguments between Mongo and J.S. and "bragged" that he had shot J.S. 11 times. Approximately one month later, I.L. reported Vargas's statements to the police and identified Vargas from a photographic lineup.

¶7          The State charged Vargas with first-degree murder and misconduct involving weapons.[1] Vargas testified at trial, claiming that he was not the shooter. Vargas acknowledged that he and Mongo were in the same gang and that Mongo was a senior member. He confirmed that he went to the apartment complex with Mongo to collect money from J.S., that they left the complex after the first argument and returned later looking for J.S., that J.S. pulled out a gun and pointed it at Mongo during the second argument, and that J.S. went to his apartment after the encounter ended. Vargas further testified, however, that when J.S. came out into the parking lot to talk to Mongo, Mongo shot and killed him.

¶8          After a 16-day trial, the jury found Vargas guilty of first-degree murder. The superior court sentenced Vargas to natural life in prison, and Vargas timely appealed. We have jurisdiction under A.R.S. § 13-4033(A).

## DISCUSSION

### I.    Other-Act Evidence.

¶9          Vargas argues that the superior court erred by permitting the State to present evidence of his gang affiliation and by failing to *sua sponte* declare a mistrial after a witness testified that she saw Vargas with a gun the day before the murder.

¶10          Evidence of a defendant's "other crimes, wrongs, or acts" is generally inadmissible to prove action in conformity with those other acts. Ariz. R. Evid. 404(b). Other-act evidence may, however, be admitted for other, non-propensity purposes such as motive, opportunity, intent, or identity. *Id.*; *see also State v. Ferrero*, 229 Ariz. 239, 245, ¶ 29 (2012). Such non-propensity other-act evidence is admissible if (1) it is relevant, (2) it is offered for a proper purpose, (3) its probative value is not substantially

---

[1]    The misconduct involving weapons count was severed for trial, and Vargas eventually pleaded guilty to that charge. That conviction and the resulting concurrent 12-year sentence is not at issue on appeal.

outweighed by the danger of unfair prejudice, and (4) clear and convincing evidence establishes that the defendant committed the other act. *State v. Mott*, 187 Ariz. 536, 545–46 (1997); *State v. Terrazas*, 189 Ariz. 580, 582 (1997). The superior court must, if requested, provide an appropriate limiting instruction constraining the jury's use of the evidence for only proper purposes. *Mott*, 187 Ariz. at 545. We generally review the admission of other act evidence for an abuse of discretion. *State v. VanWinkle*, 230 Ariz. 387, 393, ¶ 18 (2012).

### A. Gang Affiliation.

**¶11**         During trial, the State moved to present evidence of Vargas's gang membership, arguing as relevant here that the gang evidence was admissible under Rule 404(b) to prove motive. The superior court admitted portions of the gang evidence on that basis, limited to four areas: Vargas and Mongo's membership in the same gang, evidence that flashing a gun would constitute disrespect, retaliation for disrespect "on the streets and in gangs," and Mongo's act to clear out the apartment complex before the murder. The court specified that it would give a limiting instruction if requested, but Vargas did not request one.

**¶12**         Consistent with this ruling, the State's gang expert informed the jury that "respect is the most important thing to a criminal street gang member and to a criminal street gang as an organization," explaining that respect was tied to power. The expert emphasized that disrespect is not tolerated and retribution for disrespect is essential. He explained that a younger member would gain respect by acting on behalf of a senior member.

**¶13**         Vargas argues that the gang-affiliation evidence was improperly admitted under Rule 404(b). He asserts that the evidence was irrelevant and used as propensity evidence rather than for a proper purpose. But the gang evidence was relevant and admissible for the appropriate purpose of showing Vargas's motive. Although the State is not required to prove motive in a murder prosecution, motive remains relevant. *See State v. Hargrave*, 225 Ariz. 1, 8–9, ¶ 14 (2010); *State v. Hunter*, 136 Ariz. 45, 50 (1983). And here, the gang evidence helped to explain why Vargas would perceive J.S.'s act of flashing a gun at Mongo as an act of disrespect warranting retaliation and why Vargas, a younger member of the gang, would retaliate on behalf of senior member Mongo by murdering J.S. *See State v. Jackson*, 186 Ariz. 20, 26 (1996). Additionally, this evidence showed how the murder was premeditated instead of a random, unprovoked act of violence.

¶14        Although Vargas argues broadly that the gang evidence was unduly prejudicial, the superior court carefully reviewed the evidence and crafted a detailed ruling allowing consideration of relevant, probative evidence while limiting unfair prejudice. *See State v. Canez*, 202 Ariz. 133, 153, ¶ 61 (2002); *see also State v. Lee*, 189 Ariz. 590, 599–600 (1997). We discern no error.

### B.        Vargas's Prior Possession of an Unusual Gun.

¶15        Vargas argues for the first time on appeal that the superior court erred by failing to declare a mistrial after R.L. testified that she saw Vargas with a gun the day before the murder. Because Vargas did not object at trial, we review only for fundamental, prejudicial error. *See State v. Escalante*, 245 Ariz. 135, 142, ¶ 21 (2018).

¶16        Without objection, R.L. testified that, while spending time with Vargas and Mongo the day before the murder, she saw Vargas with a "special kind of gun" that did not look "normal." R.L. had previously disclosed to investigators that she saw Vargas on the day of the murder with this same 9mm gun that had an "extended magazine and clip." Additionally, another witness, I.L., testified that he later saw Vargas at Mongo's house with a gun with an extended magazine, consistent with R.L.'s description.

¶17        Vargas suggests that R.L.'s testimony about his possession of a gun the day before the murder was improper propensity evidence used solely to portray him as a "violent criminal who routinely possessed guns" and thereby play on the jurors' emotions. But even assuming this testimony constituted other-act evidence, it was nevertheless relevant and admissible for the non-propensity purpose of identity. R.L. recognized this gun as the same weapon she saw in Vargas's hand when he shot J.S. Vargas's possession of a 9mm gun before, during, and after the murder linked him to the 9mm bullets extracted from the victim's body as well as to the seventeen 9mm bullet casings—all fired from a single gun—that were recovered at the scene.

¶18        Moreover, R.L.'s description of a "special kind of gun" that did not look "normal"—one she had described to investigators as having an extended magazine—linked Vargas's gun to the otherwise anomalous shooting pattern. The shooter fired seventeen shots without stopping or reloading, which a "normal" 9mm handgun could not accomplish. But the testimony about Vargas's identifiable, altered gun with an extended magazine showed how his "special" 9mm was able to perform rapid

sequential shooting, further implicating his involvement. R.L.'s testimony was thus relevant to the non-propensity purpose of identity. *See State v. Nordstrom*, 200 Ariz. 229, 249, ¶ 65 (2001), *abrogated on other grounds by State v. Ferrero*, 229 Ariz. 239 (2012).

**¶19** Vargas further argues that this evidence was unduly prejudicial, but while the evidence may have been adversely probative — precisely because it was relevant and implicated his involvement — it did not suggest a jury decision on any improper basis. *See State v. Schurz*, 176 Ariz. 46, 52 (1993); *see also Lee*, 189 Ariz. at 599–600. Accordingly, the superior court did not err by failing to *sua sponte* declare a mistrial on this basis.

## II. R.L.'s Competency to Testify.

**¶20** Next, Vargas argues for the first time on appeal that the superior court erred by failing to examine R.L.'s competency to testify, asserting that R.L.'s drug use on the day of the shooting should have precluded her testimony. Because Vargas did not raise this issue before the superior court, we review only for fundamental, prejudicial error. *Escalante*, 245 Ariz. at 142, ¶ 21.

**¶21** Generally, every person is competent to testify as a witness. *See* A.R.S. § 13-4061; Ariz. R. Evid. 601. A witness is incompetent to testify, however, if "unable to understand the nature of an oath[] or perceive the event in question and relate it to the court." *State v. Peeler*, 126 Ariz. 254, 256 (App. 1980).

**¶22** Here, R.L. claimed she had smoked methamphetamine "all day" before the shooting and testified that her statements should not be trusted because her memory and perception were altered by drug use. But there was no suggestion that she was impaired or otherwise incoherent while testifying. *See State v. Moore*, 222 Ariz. 1, 11, ¶ 46 (2009). R.L.'s ability to observe and recall the murder and any inconsistencies in her various accounts of the event go to her credibility, not her competency to testify. *See State v. Roberts*, 139 Ariz. 117, 121 (App. 1983). R.L. admitted her drug use and volunteered that her prior statements were not credible, and Vargas had an opportunity to attack R.L.'s credibility through cross-examination. *See Canez*, 202 Ariz. at 149, ¶ 39 (noting that witness credibility is a question for the jury). Vargas's competency argument thus fails.

## III.    Sufficiency of the Evidence.

**¶23**    Vargas further argues that the State failed to present sufficient evidence to support a conviction of first-degree murder and that the superior court thus erred by denying his motion for judgment of acquittal. We review this claim of error de novo. *See State v. West*, 226 Ariz. 559, 562, ¶ 15 (2011).

**¶24**    A judgment of acquittal is appropriate "if there is no substantial evidence to support a conviction." Ariz. R. Crim. P. 20(a)(1). Substantial evidence is evidence, whether direct or circumstantial, from which a reasonable jury could find each element of an offense proven beyond a reasonable doubt. *West*, 226 Ariz. at 562, ¶ 16.

**¶25**    Conviction of first-degree murder requires proof that the defendant, acting with premeditation and intending or knowing that his conduct will cause death, caused the death of another person. A.R.S. § 13-1105(A)(1). "'Premeditation' means that the defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by any length of time to permit reflection." A.R.S. § 13-1101(1).

**¶26**    Substantial evidence supports the jury's verdict in this case. Although R.L.'s trial testimony differed, she reported on several occasions that she saw Vargas with the murder weapon the day before and the day of the murder, saw Vargas present during arguments between Mongo and J.S., and ultimately saw Vargas shoot and kill J.S. I.L. later heard Vargas describe the events, confess to shooting J.S. eleven times, and generally "brag" about the murder, all of which corroborated R.L.'s initial reports. Although Vargas asserts that this testimony—particularly R.L.'s testimony—was "inconsistent" and "unbelievable," variations in R.L.'s account were simply matters for the jury to consider when assessing her credibility and the weight to afford this evidence. *See State v. Williams*, 209 Ariz. 228, 231, ¶ 6 (App. 2004).

**¶27**    Vargas further challenges the proof of premeditation, asserting that the State failed to provide direct evidence of this element of the offense. But premeditation may be shown through circumstantial evidence, *see State v. Boyston*, 231 Ariz. 539, 551, ¶ 60 (2013), and the State did so here through proof of a gang-related retributive motive, the proximity in time between J.S.'s act of disrespect and the murder, and Vargas's shooting behavior.

¶28     The gang evidence provided a basis for the jury to conclude that Vargas had a motive to murder J.S. as retribution for his alleged disrespect of a senior member of the gang.  Vargas and Mongo had been searching for J.S. after the first argument, even clearing out the apartment complex in the process.  Vargas shot his 9mm handgun at J.S. seventeen times in rapid succession, hitting J.S. fourteen times, including while he was on the ground and defenseless.  The retributive motive, the proximity in time between J.S.'s act of disrespect and the murder, and Vargas's shooting behavior permitted the jury to draw a reasonable conclusion that Vargas acted after reflection.  *See VanWinkle*, 230 Ariz. at 392, ¶ 16 (describing a "prolonged, brutal attack" as evidence of premeditation); *see also State v. Ellison*, 213 Ariz. 116, 134, ¶ 70 (2006).

¶29     Because substantial evidence supported the conviction, the superior court did not err by denying Vargas's motion for judgment of acquittal.

## IV.    Alleged Juror Misconduct.

¶30     Finally, Vargas argues that the superior court erred by denying his motion for mistrial based on alleged juror misconduct.  We review the denial of a motion for mistrial on this basis for an abuse of discretion.  *State v. Burns*, 237 Ariz. 1, 26, ¶ 112 (2015).

¶31     Generally, a new trial may be warranted if a juror or jurors committed misconduct by:

> (A)    receiving evidence not admitted during the trial . . . ;

> (B)    deciding the verdict by lot;

> (C)    perjuring himself or herself, or willfully failing to respond fully to a direct question posed during the voir dire examination;

> (D)    receiving a bribe or pledging his or her vote in any other way;

> (E)    becoming intoxicated during trial proceedings or deliberations; or

> (F)    conversing before the verdict with any interested party about the outcome of the case.

Ariz. R. Crim. P. 24.1(c)(3). Additionally, a defendant alleging misconduct must show actual prejudice resulting from the misconduct or that the facts support a fair presumption of prejudice. *Burns*, 237 Ariz. at 26, ¶ 112.

¶32        During deliberations, Juror 3 reported her belief that another juror had improperly made up his mind with "great prejudice," used his experience growing up around gangs to reach his verdict, and berated another juror. Vargas immediately moved for a mistrial, which the superior court denied as premature pending further examination of each juror.

¶33        The superior court then repeated the admonition to the jury and conducted individual questioning. Juror 3 identified Juror 15 as the subject of her concern, but she stated that Juror 15 had not affected her ability to deliberate fairly and impartially and that she could "absolutely" decide the case based solely on the evidence. Juror 15, in turn, reported that he had reached his verdict in compliance with the admonition but expressed impatience with the deliberation process, citing hardship with his employment. The court ultimately excused Juror 15 for hardship and recalled an alternate.

¶34        Each of the other jurors reported compliance with the admonition and jury instructions, both individually and collectively. No other juror complained of Juror 15 or otherwise echoed Juror 3's concerns. And each juror affirmed his or her ability to decide the case fairly and impartially. The court found each juror credible.

¶35        Vargas again moved for a mistrial, asserting that "there's something [prejudicial] going on with this jury." The superior court denied the motion.

¶36        On appeal, Vargas asserts that the court erred by failing to grant a mistrial based on Juror 15's conduct. But despite Juror 3's misgivings, no juror reported a violation of the admonition or instructions, and each juror—including Juror 3—affirmed his or her ability to be fair and impartial. We defer to the superior court's finding that these statements were credible. *See State v. Hall*, 204 Ariz. 442, 449, ¶ 23 (2003). Moreover, Juror 15's dismissal for an alternative, legitimate purpose ameliorated the possibility of prejudice in deliberations. The superior court instructed the jurors not to consider Juror 15's departure when it reconstituted the jury, and we presume the jurors follow such instructions. *See State v. Newell*, 212 Ariz. 389, 403, ¶ 68 (2006). Thus, even assuming some of Juror 15's conduct was improper, Vargas has failed to show actual prejudice or a factual basis supporting a presumption of prejudice. *See Burns*, 237 Ariz. at 26, ¶ 112.

For the first time on appeal, Vargas also asserts that several other statements made by jurors during the court's questioning reveal additional juror misconduct. Because he did not raise these issues before the superior court, we review only for fundamental, prejudicial error. *See Escalante*, 245 Ariz. at 142, ¶ 21.

**¶37** First, Vargas points to a statement from a juror that the case's cause number, which included a "001," had led to a discussion of whether there was a second trial with a "002" involving potential co-defendants or accomplices. But the court resolved this issue with the parties' agreement, explaining to the jury that "001" referred to an "internal accounting computer thing," instructing the jury not to consider the issue during deliberation, and re-reading the "absence of other participants" jury instruction. Moreover, the issue of accomplice liability was properly before the jury based on the State's argument that Vargas remained liable as an accomplice even if a juror was not convinced that he shot the victim.

**¶38** Additionally, Vargas asserts that one juror's reference to another juror as a "special little man" because of "his personality" evidenced bullying, and further suggests that a few vague responses about whether any juror had violated or had witnessed a violation of the admonition—specifically, "not in front of me," "I believe I have [complied]," and "I don't believe so"—showed misconduct. These assertions of misconduct are vague and speculative at best. *See State v. Tison*, 129 Ariz. 526, 535 (1981); *see also State v. Davis*, 137 Ariz. 551, 558 (App. 1983). The "special little man" comment does not by itself show "bullying," and the juror denied that any such problem occurred. Likewise, the statements of "not in front of me," "I believe I have," and "I don't believe so" were denials that misconduct occurred. We discern no error.

## CONCLUSION

**¶39** For the foregoing reasons, we affirm Vargas's conviction and sentence.



AMY M. WOOD • Clerk of the Court
FILED: AA